[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 19-13926

_____

ANTONIO GONZALEZ CARRIZOSA, et al.,

Plaintiffs,

DOE 378,

LUDY RIVAS BORJA, as daughter and successor
to DOE 840 (deceased),

ANA OFELIA TORRES TORRES,

PASTORA DURANGO,

GLORIA EUGENIA MUNOZ,

JOSE LOPEZ 339,

JUANA DOE 11 and MINOR DOE 11A,

JUANA PEREZ 43A,

JANE DOE 7,

JOHN DOE 7, individually and as representative
of his deceased son JOHN DOE 8,

2                  Opinion of the Court                  19-13926

JUVENAL ENRIGUE FONTALVO CAMARGO,
NANCY MORA LUMUS,
SARA MATILDE MANJARRES,

Plaintiffs-Appellants
Cross-Appellees,

*versus*

CHIQUITA BRANDS INTERNATIONAL, INC.,

Defendant-Appellee
Cross-Appellant,

CHIQUITA FRESH NORTH AMERICA LLC.,
a Delaware Corporation, et al.,

Defendants,

KEITH E. LINDNER,
CHARLES KEISER,
CARLA A. HILLS, as representative of the Estate
of RODERICK M. HILLS, SR.,
CYRUS FRIEDMAN,
ROBERT F. KISTINGER,
ROBERT W. OLSON,

19-13926               Opinion of the Court                    3

WILLIAM A. TSACALIS,

Defendants-Appellees
Cross-Appellants.

DOES 1 THROUGH 976, et al.,

Plaintiffs,

DOE 378,
LUDY RIVAS BORJA as daughter and successor
to DOE 840 (deceased),

Plaintiffs-Appellants,
Cross-Appellees.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:08-md-01916-KAM

_____

Before JORDAN, NEWSOM, and ED CARNES, Circuit Judges.

JORDAN, Circuit Judge:

This appeal arises from a massive and complex multi-district litigation proceeding based on claims—brought in part under the Torture Victim Protection Act, 28 U.S.C. § 1350 note, and Colombian law—that Chiquita Brands International and some of its executives provided financial support to the Autodefensas Unidas de Colombia, which murdered thousands of persons in Colombia. In a dozen bellwether cases, the district court issued a comprehensive order granting summary judgment in favor of the defendants. After excluding some of the plaintiffs' evidence, the court ultimately concluded that the plaintiffs "fail[ed] to identify any admissible evidence" in support of their allegations that the AUC had killed their respective decedents. *See* D.E. 2551 at 71.

On appeal, the plaintiffs argue that the district court abused its discretion in excluding much of their evidence and that genuine issues of material fact precluded summary judgment on their claims. The individual defendants cross-appeal (1) the order denying their motion to dismiss the plaintiffs' TVPA claims, and (2) the ruling that one individual defendant, Carla Hills (as personal representative of the Estate of Roderick Hills), waived her personal jurisdiction argument. As to the TVPA claims, the individual defendants argue that the allegations in the complaint were insufficient under Rule 12(b)(6). Ms. Hills, for her part, contends that she timely raised her personal jurisdiction objection.

Following oral argument and a review of the extensive record, we affirm in part, vacate in part, reverse in part, and dismiss in part. With respect to the evidentiary rulings, we conclude that the

district court got some right and some wrong.  As to the merits, we hold that most of the bellwether plaintiffs presented sufficient evidence to withstand summary judgment with respect to whether the AUC was responsible for the deaths of their decedents.  On the cross-appeals, we do not reach the arguments presented by the individual defendants and Ms. Hills.[1]

I[2]

Between 1997 and 2004, Chiquita Brands International paid over $1.7 million to the AUC, a paramilitary group designated as a foreign terrorist organization by the United States Secretary of State.  During this time, Colombia was in the midst of a civil war between paramilitary groups, like the AUC, and guerillas.  "[T]he AUC was closely aligned—and even intertwined—with the Colombian [government] through its ideologies and practices that revolved around their shared goals of eliminating the 'subversive' threat posed by guerrilla groups."  D.E. 2346-5 at 1.  *See also* D.E. 2346-1 at 2.  The AUC "controll[ed] territory by terror," App. 8531, and was well known for perpetrating violence not just against

---

[1] We thank the district court for its extensive work and thorough opinion in this complex MDL proceeding.

[2] In citing to the voluminous record, we refer to docket entries wherever possible, but occasionally cite to the appendices filed by the plaintiffs.  Although the plaintiffs filed certain documents under seal, they have referred to and quoted from several of those sealed documents in their publicly-filed briefs.  So we, too, use those portions of the sealed filings to the extent we find it necessary.

6                    Opinion of the Court                    19-13926

guerrilla fighters, but also against innocent civilians.  *See* D.E. 2346-1 at 2; D.E. 2348-4 at 19–20.

Eventually, the United States learned of Chiquita's payments to the AUC and charged the company with engaging in transactions with a specially-designated global terrorist organization.  Chiquita pled guilty to the charge in 2007.  *See* Plea Agreement, D.E. 11, *United States v. Chiquita Brands Int'l*, Case No. 07-CR-00055-RCL (D.D.C. Mar. 19, 2007).

In response, many people who suspected the AUC of killing their family members and loved ones sued a number of defendants, including Chiquita and some of its executives.  As relevant here, the bellwether plaintiffs asserted tort claims under Colombian law and federal claims under the Torture Victim Protection Act, 28 U.S.C. § 1350 note, alleging that the defendants' financial support of the AUC led to the group's murder of their family members and loved ones.  The plaintiffs conceded that to prevail on their claims they had to "show, as a factual predicate for all of their claims, that the AUC was responsible for the murder of each decedent."  D.E. 2551 at 4.[3]

---

[3] With respect to Chiquita, the only bellwether claims left are those brought under Colombian law.  *See In re Chiquita Brands Int'l, Inc. Derivative Litig.*, 2019 WL 11497632, at *2 (S.D. Fla. Sept. 5, 2019).  *See also Mohamad v. Palestinian Auth.*, 566 U.S. 449, 461 (2012) (holding that the TVPA "did not extend liability to organizations, sovereign or not"); *Cardona v. Chiquita Brands Int'l, Inc.*, 760 F.3d 1185, 1188–89 (11th Cir. 2014) (dismissing similar claims against Chiquita under the TVPA and the Alien Tort Statute, 28 U.S.C. § 1350).

An MDL panel consolidated the plaintiffs' cases for pretrial proceedings in the Southern District of Florida. A dozen of those cases were then selected as bellwether cases. As relevant here, the district court denied the individual defendants' motion to dismiss the TVPA claims and ruled that Ms. Hill had waived her personal jurisdiction argument.

Chiquita and the individual defendants then moved for summary judgment on multiple grounds. The district court concluded that the plaintiffs had not presented sufficient admissible evidence demonstrating that the AUC was involved in the death of their family members and loved ones and therefore could not show the existence of a genuine issue of material fact for an essential element of their claims.

The district court therefore granted summary judgment in favor of all the defendants with respect to the claims of the bellwether plaintiffs. It ruled that (1) the plaintiffs' documentary evidence was comprised mostly of inadmissible hearsay, "and even if accepted for its substantive content, [would not] support the inferences urged by [the p]laintiffs"; (2) the testimonial evidence constituted inadmissible hearsay, and the plaintiffs did not lay the foundation for any hearsay exceptions; (3) the "circumstantial evidence, standing alone, [was] too speculative to support a reasonable inference that the AUC more likely than not was responsible for the death of each bellwether victim, and would be insufficient to withstand a directed verdict at trial"; and (4) the ultimate expert opinions regarding AUC involvement in the deaths of the bellwether

decedents were inadmissible under Federal Rule of Evidence 702 in part because they "[did] not involve the application of reliable methodologies or principles." D.E. 2551 at 71. Based on these determinations, the court concluded that the plaintiffs could not withstand summary judgment on their claims because they did not have "any admissible evidence supporting their foundational allegation that the AUC killed their decedents." *Id.*[4]

## II

Two sets of bellwether plaintiffs—whom we'll call the Wolf plaintiffs (based on the name of their attorney) and the Non-Wolf plaintiffs where necessary—challenge a number of evidentiary rulings by the district court. We generally review those rulings for an abuse of discretion. *See Fid. Interior Constr., Inc. v. S.E. Carpenters Reg'l Council*, 675 F.3d 1250, 1258 (11th Cir. 2012). "[T]he abuse of discretion standard allows 'a range of choice for the district court, so long as that choice does not constitute a clear error of judgment.'" *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc) (quoting *In re Rasbury*, 24 F.3d 159, 168 (11th Cir. 1994)). A district court "necessarily abuse[s] its discretion" if it bases a ruling "on an erroneous view of the law" or "on a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990). So when we conclude that the

---

[4] The district court entered partial final judgment pursuant to Rule 54(b) in favor of the defendants as to the bellwether plaintiffs' claims under Colombian law and the TVPA.

district court erred, we mean to say that the district court abused its discretion in one of these ways.

With this standard in mind, we turn to the contested evidentiary rulings.[5]

## A

The Non-Wolf plaintiffs argued below that several pieces of evidence—the indictment of AUC leader Raúl Hasbún and several letters from Colombian prosecutors—were admissible under the business record and public record exceptions to the hearsay rule. *See* Fed. R. Evid. 803(6), 803(8). The Wolf plaintiffs made the same argument as to certain letters from prosecutors. The district court excluded the evidence from both sets of plaintiffs. We conclude that the Hasbún indictment was admissible under both exceptions, that the Non-Wolf plaintiffs' letters must be reconsidered under Rule 803(8) on remand, and that the Wolf plaintiffs' letters were properly excluded.

A document is admissible as a business record under Rule 803(6) if (1) it was made at or near the time of an event by someone with knowledge, (2) it was kept in the regular course of business, (3) it was the organization's regular practice to make such a record, (4) a qualified witness is able to testify to these facts, and (5) the opponent of the document does not show a lack of

---

[5] Some of the challenged evidentiary rulings are subject to plenary review. Where that is the case, we note the different standard in the text.

trustworthiness.  *See* Fed. R. Evid. 803(6); *Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*, 556 F.3d 1232, 1243 (11th Cir. 2009).  "The touchstone of admissibility under [Rule 803(6)] is reliability[.]" *United States v. Bueno-Sierra*, 99 F.3d 375, 378 (11th Cir. 1996).

Under Rule 803(8), a document is admissible in a civil case as a public record if it is "[a] record or statement of a public office" that "sets out . . . factual findings from a legally authorized investigation[,] and . . . the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)(iii), 803(8)(B).  "[P]ortions of investigatory reports otherwise admissible under [the public-records exception] are not inadmissible merely because they state a conclusion or opinion." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 170 (1988).  And "[n]o distinction is drawn between federal and nonfederal records—the sole criterion is whether the record is that of a 'public office.'" 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Fed. Evid. § 803.10[1] (2d ed. 2022).

Significantly, only minimal foundational testimony is required in order to admit public records under Rule 803(8).  *See United States v. Loyola-Dominguez*, 125 F.3d 1315, 1318 (9th Cir. 1997) ("[T]he public records exception is one of the few hearsay exceptions that does not require a foundation."); 5 Weinstein's Fed. Evid. at § 803.10[2] ("Since the assurances of accuracy are generally greater for public records than for regular business records, the proponent is usually not required to establish their admissibility

through foundation testimony."). Moreover, the party attempting to admit the evidence does not need to establish that the report is trustworthy; "[t]he burden is on the party opposing admission to prove the report's untrustworthiness." *Crawford v. ITW Food Equip. Grp., LLC*, 977 F.3d 1331, 1347 (11th Cir. 2020) (citation omitted). This is because of the "reliability gained from regularly conducted activities generally," the "assumption that a public official will perform his duty properly[,] and the unlikelihood that he will remember details independently of the record." *United States v. Garland*, 991 F.2d 328, 335 (6th Cir. 1993) (quotation marks omitted).

1

Four of the plaintiffs—Ana Ofelia Torres Torres, Gloria Eugenia Muñoz, Pastora Durango, and John Doe 7—submitted an excerpt of the Colombian indictment of AUC leader Raúl Hasbún (sometimes referred to by the parties as Record 138). *See* D.E. 2346-78. Appended to the indictment was a chart listing multiple homicides associated with Mr. Hasbún.[6]

The district court excluded the Hasbún indictment, ruling that the document did not satisfy either Rule 803(6) or Rule 803(8). The court explained that the indictment was not admissible as a business record because it did not contain the custodian's

---

[6] The chart included the decedents of these four plaintiffs. Those decedents are Ceferino Antonio Restrepo Tangarife, Miguel Angel Cardona Muñoz, Waynesty Machado Durango, and John Doe 8.

testimony or a certification indicating that perjury would result in criminal liability in Colombia. And it was not admissible as a public record because the plaintiffs "[did] not demonstrate that th[e] document set[ ] out a 'matter observed while under a legal duty,' nor [did] it appear that th[e] document set[ ] out factual findings based on a legally authorized investigation." D.E. 2551 at 32.

In order to lay the foundation for the admissibility of the Hasbún indictment, the plaintiffs presented the declaration of Nelson Camilo Sánchez León, a Colombian lawyer and the Director of the International Human Rights Clinic at the University of Virginia School of Law. *See* D.E. 2510-1. His declaration detailed the procedures of the Justice and Peace process under Colombian law, and attached a translated copy of the Justice and Peace Act as an exhibit.

Mr. Sánchez León stated that the "objective of the Justice and Peace Process is to guarantee victims' rights to truth, justice, and reparation." *Id.* at ¶ 9. In furtherance of that goal, the Justice and Peace Act incentivizes "demobilized" paramilitary group members to truthfully confess to crimes committed during their time as paramilitaries by offering "alternative lesser penalties" in exchange. *See id.* at ¶ 10. As part of this process, both the executive and judicial branches in Colombia carry out independent investigations to corroborate any confession made by a paramilitary participant. A special prosecutorial body—the Justice and Peace Unit of the Colombian Office of the Public Prosecutor—undertakes these investigations and preserves all records. A paramilitary participant

19-13926            Opinion of the Court            13

who is found to have lied can be subject to criminal proceedings for having given false testimony. These penalties may be imposed on a paramilitary participant for either "fail[ing] to confess to a crime" he committed or for "confess[ing] to a crime that [he] did not in fact commit." *Id.* at ¶ 19.[7]

With respect to the Hasbún indictment, Mr. Sánchez León said the following. First, the homicides listed in the chart appended to the indictment were murders to which Mr. Hasbún had confessed during an earlier phase of the Justice and Peace process. Second, "[a]ny acts to which the paramilitary [participant] does not accept responsibility cannot be processed through Justice and Peace." *Id.* at ¶ 34 (citing Justice and Peace Act, art. 21). Third, a prosecutor cannot charge a paramilitary participant based solely on his confession; the prosecutor must "undertake 'serious and exhaustive investigations' to verify the truth of those confessions." *Id.* at ¶ 22 (footnote omitted).

The district court excluded Mr. Sánchez León's declaration from the summary judgment record because it was untimely filed, and thus did not consider it "in [its] assessment of the sufficiency of [the plaintiffs'] proofs on causation." D.E. 2551 at 31. The court also concluded that, even if accepted, the declaration "does not

---

[7] For additional background on the Justice and Peace Act, see, e.g., Courtney Hillebrecht et al., *The Judicialization of Peace*, 59 Harv. Int'l L.J. 279 (2018), and José E. Arvelo, *International Law and Conflict Resolution in Colombia: Balancing Peace and Justice in the Paramilitary Demobilization Process*, 37 Geo. J. Int'l L. 411 (2006).

14                    Opinion of the Court                    19-13926

supply a foundation for admission of the proffered Colombian government records under the hearsay exceptions advanced by [the plaintiffs]." *Id.*[8]

We first address the timeliness of the Sánchez León declaration. The plaintiffs filed the declaration in support of their court-ordered supplemental brief on hearsay challenges. *See* D.E. 2499, 2510. The plaintiffs were responding to the argument made by the defendants in their summary judgment reply that certain evidence was inadmissible on hearsay grounds. The defendants had not previously challenged the plaintiffs' evidence on those grounds, so the supplemental brief was the plaintiffs' first opportunity to respond to the objection. *See generally* 4 Christopher B. Mueller et al., Fed. Evid. § 8:64 (4th ed. & 2021 update) (noting that Rule 802's bar against hearsay "is not self-executing" and "requires a timely objection").

Our cases recognize "the importance of giving the non-movant a meaningful opportunity to respond to a motion for summary judgment." *Burns v. Gadsden State Cmty. Coll.*, 908 F.2d 1512, 1516 (11th Cir. 1990). As the Seventh Circuit has put it, "[d]istrict courts abuse their discretion when they deny a party a chance to respond to new arguments or facts raised for the first time in a reply brief in support of a motion for summary judgment

---

[8] Despite excluding the declaration, the district court seemingly relied on Mr. Sánchez León's explanation of the Justice and Peace process in its order. *See* D.E. 2551 at 5 n.4.

and subsequently enter judgment on the basis of those new arguments or facts." *Physicians Healthsource, Inc. v. A-S Medication Sols., LLC*, 950 F.3d 959, 968 (7th Cir. 2020). *See also First Specialty Ins. Corp. v. 633 Partners, Ltd.*, 300 F. App'x 777, 788 (11th Cir. 2008) ("[A] district court can abuse its discretion by failing to give the opposing party a chance to respond to materials presented for the first time in a reply brief and instead granting summary judgment on the basis of that evidence.").

In this case, the district court abused its discretion in excluding the Sánchez León declaration on timeliness grounds. In our view, the plaintiffs timely filed the Sánchez León declaration in response to hearsay objections the defendants first raised in their summary judgment reply. With the benefit of the declaration, we conclude that the plaintiffs established the foundation for the admissibility of the Hasbún indictment under both Rule 803(6) and Rule 803(8).

The Hasbún indictment is admissible as a business record under Rule 803(6). The district court was concerned with the plaintiffs' purported failure to have a proper, qualified witness to testify to the foundational facts under Rule 803(6). Mr. Sánchez León, however, demonstrated in his declaration that he is a sufficiently qualified witness to lay the necessary foundation. "A qualified witness is one who can explain the system of record keeping and vouch that the requirements of Rule 803(6) are met." *Curtis v. Perkins*, 781 F.3d 1262, 1268 (11th Cir. 2015) (quoting *United States v. Box*, 50 F.3d 345, 356 (5th Cir. 1995)). The witness "need not be

the [one] whose first-hand knowledge was the basis of the facts sought to be proved." *Bueno-Sierra*, 99 F.3d at 379. *See* 5 Weinstein's Fed. Evid. § at 803.08[8][a] ("The phrase [a ']qualified witness' is given a very broad interpretation. The witness need only have enough familiarity with the record-keeping system of the entity in question to explain how the record came into existence . . . . In fact, the witness need not even be an employee of the record-keeping entity . . . ."). The declaration shows that Mr. Sánchez León is such a witness. He is a Colombian lawyer and the Director of the International Human Rights Clinic at the University of Virginia School of Law. And he is "deeply familiar" with the Justice and Peace process through which the Hasbún indictment was prepared, as well as the legal framework behind it. *See* D.E. 2510-1 at ¶ 6.

The Hasbún indictment also meets the requirements of the public records hearsay exception under Rule 803(8). It sets forth the findings of the Justice and Peace prosecutors that Mr. Hasbún was responsible for the listed homicides, which satisfies Rule 803(8)(A)(iii). Mr. Sánchez León stated that persons making false confessions are subject to perjury charges in Colombia, and prosecutors must corroborate a confession through an independent investigation. These matters tend to show that the indictment is trustworthy absent evidence to the contrary from the defendants. *Cf. Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 412 (6th Cir. 2006) ("The notices of arrest, Korean complaint, and the investigative reports are generally admissible under the public-records

exception, as set forth in Rule 803(8)."), *abrogation recognized as to another issue in A.K. v. Durham Sch. Servs., L.P.*, 969 F.3d 625, 630 (6th Cir. 2020).

Because the Hasbún indictment is admissible as both a business record and a public record, the district court erred in excluding it.[9]

### 2

John Doe 7, Juvenal Fontalvo Camargo, Juana Pérez 43A, and Juana Doe 11 and Minor Doe 11A submitted various letters by Colombian prosecutors and investigators from the Justice and Peace process. The letters offered by Juvenal Fontalvo Camargo, Juana Pérez 43A, and Juana Doe 11 and Minor Doe 11A discussed the process with respect to AUC leader José Lugo Mangones (also called *El Tijeras*). John Doe 7's letter discussed Mr. Hasbún's proceedings in the Justice and Peace process. We summarize the letters below.

♦ The letter offered by Mr. Camargo, from a criminal investigator, stated that Mr. Mangones "accepted his participation in the homicide" of the decedent and listed the possible dates on which he would be indicted in the Court of Justice and Peace. *See* D.E. 2346-60.

---

[9] Given our ruling, the plaintiffs' motion to supplement the appellate record and/or for judicial notice as to the Hasbún indictment is denied as moot.

♦ The first Juana Pérez 43A letter, from a prosecutor, stated that Mr. Mangones confessed to the homicide of the decedent; that charges were filed against him; that the magistrate "ordered a measure of preventative detention against" Mr. Mangones because of the homicide; that the criminal charges "were confirmed"; that a "sentence judgment" was issued; that the judge "ruled in favor of the victims" as to damages; and that there was an appeal. *See* D.E. 2346-50. The letter also stated that the decedent's "homicide" was "attributable to members of the extinct northern block of the William Rivas Front of the AUC." *Id.*

♦ The second Juana Pérez 43A letter, also from a prosecutor and in response to the plaintiffs' request for a copy of the Mangones judgment, confirmed that Mr. Mangones had accepted responsibility for the decedent's homicide and repeated the timeline of his case. *See* D.E. 2346-77.

♦ The letter offered by Juana Doe 11 and Minor Doe 11A, from the Government Attorney's Office, attached a video of Mr. Mangones' confession "regarding" the decedent's homicide. *See* D.E. 2346-75.

♦ The letter offered by John Doe 7, from the Assistant to the Attorney General, stated that the matter of the decedent's homicide was being heard in the Court of Justice and Peace, that the homicide was attributed to

19-13926                Opinion of the Court                19

the AUC, that Mr. Hasbún was presumed responsible, and that Mr. Hasbún had agreed to the circumstances of the homicide. *See* D.E. 2348-129 at 35–38.

The plaintiffs argued below that these letters from Colombian prosecutors and investigators were admissible as business records under Rule 803(6) or as public records under Rule 803(8). The district court ruled that the letters were not admissible on either basis. On appeal, the plaintiffs challenge only the public records ruling.

The district court concluded that the letters were not admissible as public records because "no information [was] given as to how the prosecutors gathered the information, or from what sources that information was derived. Without knowing where or how the prosecutors obtained the information recited in [the letters], or anything about the procedures and methods *actually used* to reach the stated conclusions in the specific investigations at hand," the court said it could not conclude that Rule 803(8) was satisfied. *See* D.E. 2551 at 34.[10]

A document is admissible as a public record if it sets out either "a matter observed while under a legal duty to report" or "factual findings from a legally authorized investigation," and the

---

[10] The district court quoted an earlier version of Rule 803(8) which required that "neither the source of the information nor other circumstances indicate a lack of trustworthiness." D.E. 2551 at 34. As noted earlier, the current and applicable version requires that the opponent show untrustworthiness.

opponent has not shown "that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8). We conclude that the district court erred in ruling that the letters were not admissible under Rule 803(8).

The district court did not consider whether the letters described "a matter observed while under a legal duty to report" or "factual findings from a legally authorized investigation" under Rule 803(8) because it found that it could not determine whether those requirements were satisfied due to its own lack of knowledge regarding the "procedures and methods" used in the investigations. *See* D.E. 2551 at 34. The court cited cases where evidence was excluded because either (1) little to no information was provided or known about the investigation or source of the evidence, or (2) there was positive evidence of the document's untrustworthiness. *See Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 969–70 (D.C. Cir. 2016) (affirming the district court's exclusion of web pages because the "[a]ppellants rested on a bare, one-sentence assertion that [they] were admissible under Rule 803(8), but offered no further explication" of how the evidentiary requirements were satisfied); *United States v. El-Mezain*, 664 F.3d 467, 497–501 (5th Cir. 2011) (holding that documents seized from the Palestinian Authority in a military operation should have been excluded because they did not meet the trustworthiness requirements of Rule 807, as "there is nothing known about the circumstances under which the documents were created," including "whether the documents were created by some third person or

agency and were merely collected . . . as intelligence" and "in the case of two of the documents, the identities of the authors"); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 542, 571 (E.D.N.Y. 2012) (holding that certain reports by an alleged terrorist were not admissible because they were "based directly on [the alleged terrorist's] relaying of information of uncertain provenance" and hearsay within hearsay); *Mamani v. Berzain*, 309 F. Supp. 3d 1274, 1297 (S.D. Fla. 2018) (excluding certain military and police reports because they contained hearsay).

The letters here, however, did not have the problems identified in the cited cases. And the district court cited no basis for its implied doubt that the Colombian officials had utilized legally authorized investigations to reach the factual findings discussed in the letters. As far as we can tell from the record, there is no basis for such doubt. The plaintiffs explained that the letters came from Colombian officials involved with the Justice and Peace process, and public records from other countries can be admitted under Rule 803(8). *See, e.g.*, *United States v. Mena*, 863 F.2d 1522, 1531 (11th Cir. 1989) (admitting a Honduran document). Indeed, the court acknowledged that the letters were correspondence "issued by Colombian prosecutors, excerpted from Justice and Peace Law files." D.E. 2551 at 33–34. The letters were signed and written on official letterhead, and the defendants haven't demonstrated that the letters or the information in them was untrustworthy. *Cf. Mamani*, 309 F. Supp. 3d at 1295–96 (ruling that a "final" report prepared by

22                    Opinion of the Court                    19-13926

Bolivian prosecutors with respect to extrajudicial killings was admissible under Rule 803(8)).

A decision can constitute an abuse of discretion when it is based upon "considerations having little factual support." *Arlook v. S. Lichtenberg & Co.*, 952 F.2d 367, 374 (11th Cir. 1992). The district court here did not have evidence that the proffered letters were untrustworthy. Because the court held that it was "unable to conclude" whether the letters satisfied either of Rule 803(8)'s initial requirements due to its unsupported skepticism about the Colombian investigations, it did not address those requirements. *See* D.E. 2551 at 34. We remand so that it may do so.[11]

### 3

Doe 378 (sometimes referred to as María Dolores Roldán de Echavarria) also submitted a letter from a prosecutor's office. This letter, unlike the other letters discussed above, briefly described a homicide in which the victim died from gunshot wounds but did not name the perpetrator of the homicide. We agree with the district court that this letter was not admissible.

---

[11] Based on our remand, we deny as moot the plaintiffs' motion to supplement the appellate record and/or for judicial notice as to the letters from the Justice and Peace prosecutors. And we express no view on whether the references to Mr. Mangones' confession in some of the letters present a hearsay-within-hearsay issue. *Cf. United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) ("[P]lacing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible.").

Like the other plaintiffs with letters from prosecutors and investigators, Doe 378 argued below that her letter was admissible as a business record under Rule 803(6) or as a public record under Rule 803(8). The district court grouped her letter with all of the other letters from prosecutors and ruled that none of them were admissible on either ground. The court concluded that the letter was not admissible as a business record "because the record does not contain testimony by a custodian of the documents, or other qualified person, nor do [the plaintiffs] alternatively produce a certification showing that the letters were signed in [a] manner that, if falsely made, would subject the maker to criminal liability in Colombia." D.E. 2551 at 35 (cleaned up). Though the other plaintiffs do not contest the court's ruling as to Rule 803(6), Doe 378 does. She argues that her letter was admissible as a business record.

The district court did not err in ruling that Doe 378's letter from the prosecutor's office was not admissible as a business record. Doe 378 contends on appeal that she satisfies Rule 803(6)'s fourth requirement because she "could introduce . . . correspondence from various offices using retired employees of those offices." Wolf Plaintiffs' Initial Br. at 44. Presumably Doe 378 is referring to retired prosecutors and other Colombian officials, but even assuming that this argument was preserved below, her hypothetical and vague statement is not sufficient to satisfy the fourth requirement of Rule 803(6) and make the letter admissible. *See United States v. Dickerson*, 248 F.3d 1036, 1048 (11th Cir. 2001) (because the government failed to present a custodian or qualified witness, the

district court abused its discretion in admitting certain business records under Rule 803(6)); *Mamani*, 309 F. Supp. 3d at 1296–97 (excluding foreign military and government reports under Rule 803(6) because the plaintiffs did not submit the affidavit of a custodian or other qualified witness). Although a hearsay statement can be considered at summary judgment if it can be reduced to admissible evidence at trial, the "possibility that unknown witnesses will emerge to provide testimony . . . is insufficient to establish that the hearsay statement could be reduced to admissible evidence at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012).

## 4

For the first time in her reply brief, Doe 378 argues that two new letters, as well as the letter described above, should be admitted as public records under Rule 803(8). *See* Wolf Plaintiffs' Reply Br. at 20. She "adopt[s] by reference" the public records argument made by the other plaintiffs in their own initial brief and declines to discuss the exception (or even summarize the argument) herself. *See id.* By raising her Rule 803(8) argument in a cursory fashion, and only in her reply brief, she has abandoned this contention. We therefore do not address it. *See United States v. Thomas*, 242 F.3d 1028, 1033 (11th Cir. 2001).

## B

The district court ruled that the Hasbún indictment and all of the prosecutor letters submitted by the Non-Wolf plaintiffs were not self-authenticating. They were also not presumptively

authentic, or shown by the plaintiffs to be reducible to an admissible form. *See* D.E. 2551 at 39–42. The plaintiffs argue that the documents can be authenticated and therefore reduced to an admissible form by the time of trial, and that the defendants only objected on the ground that the documents were not yet authenticated. *See* Non-Wolf Plaintiffs' Initial Br. at 57–59. We conclude that the plaintiffs showed that the documents could be reduced to an admissible form at trial and that they should have been considered at summary judgment.[12]

At summary judgment "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Nevertheless, evidence that can be reduced to an admissible form at trial should be considered at summary judgment. *See Smith v. Marcus & Millichap, Inc.*, 991 F.3d 1145, 1156 n.2 (11th Cir. 2021) ("[E]vidence does not have to be authenticated or otherwise presented in an admissible form to be considered at the summary judgment stage, as long as the evidence could ultimately be presented in an admissible form.") (quotation marks omitted).

Foreign public documents are self-authenticating if they "purport[ ] to be signed or attested by a person who is authorized

---

[12] The district court also ruled that the Mangones *sentencia* and the Rendón Herrera judgment were not properly authenticated. Because we conclude in Part II.C that those documents were not admissible, we do not consider their authenticity here.

by a foreign country's law to do so" and are "accompanied by a final certification that certifies the genuineness of the signature and official position of the signer or attester" or of a relevant foreign official. *See* Fed. R. Evid. 902(3). "The certification may be made by a secretary of a United States embassy or legation; by a consul general, vice consul, or consular agent of the United States; or by a diplomatic or consular official of the foreign country assigned or accredited to the United States." *Id.* Alternatively, "[i]f all parties have been given a reasonable opportunity to investigate the document's authenticity and accuracy, the court may, for good cause, either (A) order that it be treated as presumptively authentic without final certification; or (B) allow it to be evidenced by an attested summary with or without final certification." *Id.*

Under the Federal Rules of Evidence, authenticity involves a two-step process.

> A district court must first make a preliminary assessment of authenticity, which requires [the] proponent to make out a prima facie case that the proffered evidence is what it purports to be. If the proponent satisfies this "prima facie burden," the inquiry proceeds to a second step, in which the evidence may be admitted, and the ultimate question of authenticity is then decided by the factfinder.

*PDVSA US Litig. Tr. v. Lukoil Pan Ams., LLC*, 991 F.3d 1187, 1191 (11th Cir. 2021) (internal quotation marks and citation omitted).

The district court ruled that the Hasbún indictment and the prosecutor letters were not properly authenticated because they were not self-authenticating, did not fall under the good cause alternative, and the plaintiffs did not identify how they would obtain the required authentication documents prior to trial. The court noted that the plaintiffs conceded that the documents did not yet have a final certification required to be self-authenticating. It also concluded that the plaintiffs had not shown good cause for the lack of final certification. The court acknowledged that the plaintiffs stated that they "intend[ed], before trial, to obtain certified copies of the correspondence from the emitting agency" and apostilles from the Colombian consulate in the United States regarding the letters and the Hasbún indictment. *See* D.E. 2551 at 40.[13]

But the district court faulted the plaintiffs for not specifying the particular people or officials from whom they expected to obtain the certified copies and apostilles, and for not showing that the

_____

[13] "An 'apostille' is an international method for verification of foreign documents similar to notarization." *Corovic v. Mukasey*, 519 F.3d 90, 93 n.2 (2d Cir. 2008). *See* Fed. R. Civ. P. 44, advisory committee note, 1991 Amendment ("The Hague Public Documents Convention provides that the requirement of a final certification is abolished and replaced with a model *apostille,* which is to be issued by officials of the country where the records are located. . . . [T]he *apostille* can be accorded greater weight than the normal authentication procedure because foreign officials are more likely to know the precise capacity under their law of the attesting officer than would an American official."). Given our ruling, we deny as moot the Non-Wolf plaintiffs' motion for judicial notice of authenticating apostilles.

certifications were missing despite the plaintiffs' reasonable efforts to secure them. The court was "mystif[ied]" as to why the plaintiffs had not yet secured the final certifications when they had several years to do so. *See id.*[14]

Although the district court's frustration was understandable, the documents did not—despite the long lead-up to summary judgment—need to have final certifications. *See Marcus & Millichap, Inc.*, 991 F.3d at 1156 n.2 (at a preliminary stage, "the evidence need not be authenticated to be considered—instead, it need only be capable of authentication"). At summary judgment, it was enough that "the evidence could ultimately be presented in an admissible form." *Id.*

Furthermore, there is no requirement that the plaintiffs specify the individuals and officials who would provide the certifications. It was sufficient that the plaintiffs identified the procedure by which they would certify the documents and make them admissible. *See* Fed. R. Civ. P. 56, advisory committee note, 2010 Amendment subdivision (c) ("The burden is on the proponent to show that the material is admissible as presented *or to explain the admissible form that is anticipated.*") (emphasis added). And they

---

[14] The district court found that the prosecutor letters were signed, but it is unclear whether it also concluded that the Hasbún indictment met the requirement that it be signed by an authorized person. *See* D.E. 2551 at 39–42. In any event, we conclude that the indictment was also signed as required. *See* D.E. 2346-78 at 21–23. *See also* D.E. 2551 at 39 (acknowledging that the Spanish version of the indictment had signatures).

did that, setting out the specific agencies and entities which would provide the necessary certifications. *See* D.E. 2551 at 40 ("As to the letters allegedly issued by Colombian prosecutors, [the p]laintiffs state that they intend, before trial, to obtain certified copies of the correspondence from the emitting agency (either the Public Prosecutor or the Center for Judicial Administration), as a precursor to seeking an apostille, and that they 'will obtain an apostille for all (Justice and Peace Law) documents from the Colombian consulate in the United States' prior to trial.") (cleaned up).

## C

The plaintiffs submitted two different documents purporting to be convictions of AUC members in the Justice and Peace process—the Mangones *sentencia* and the Rendón Herrera "First Instance Judgment"—as final judgments of conviction under Rule 803(22). We conclude that the district court correctly excluded both documents, although for different reasons.

As noted, the Justice and Peace process was one in which the Justice and Peace Unit of the Colombian Office of the Public Prosecutor investigated offenses allegedly committed by paramilitary participants, and in which AUC members could truthfully confess to crimes in order to receive sentences that were lower than they would otherwise be in the ordinary Colombian criminal system. *See* D.E. 2551 at 5 n.4 (citing to the Sánchez León declaration). Judgments issued as a part of the proceedings were the equivalent to a criminal conviction in the usual system. *See id*. *See also* Arvelo, 37 Geo. J. Int'l L. at 438 (discussing how, in the Justice and

30                    Opinion of the Court                    19-13926

Peace process, "the demobilized combatant is subject to a special expedited procedure through which he or she is prosecuted and sentenced for the crimes committed").

Rule 803(22) provides for the admissibility of "a final judgment of conviction" if the judgment satisfies certain criteria. As relevant here, those criteria are that "the judgment was entered after a trial or guilty plea," "the conviction was for a crime punishable by death or by imprisonment for more than a year," and "the evidence is admitted to prove any fact essential to the judgment." Fed. R. Evid. 803(22)(A)–(C). Rule 803(22) "has been applied to admit evidence of foreign criminal judgments," and the "pendency of an appeal . . . does not affect admissibility." 5 Weinstein's Fed. Evid. at § 803.24[1]–[2].

1

Several of the plaintiffs—Juvenal Fontalvo Camargo, Juana Doe 11, Minor Doe 11A, and Juana Pérez 43A—submitted the *sentencia* of Mr. Mangones to support their cases. The *sentencia*, which is over a thousand pages long, is a judgment of conviction against Mr. Mangones entered on July 31, 2015, in the Superior Court of Bogota, Justice and Peace Division. The district court ruled that the Mangones *sentencia* was not admissible for two reasons.

First, the district court found that the excerpts of the *sentencia* provided were too vague and that the plaintiffs failed to provide enough context for how the Colombian Justice and Peace

proceedings functioned. As a result, it was "impossible" to determine "whether the charges hinged on the geographical situs of the crimes or specific subordinate activity." D.E. 2551 at 37–38. The court seemed to doubt that the "charges were predicated on crimes actually committed by subordinates under [Mr.] Mangones' command" rather than "simply by persons committing murders in territories under [Mr.] Mangones' command." *Id.* Therefore, the court could not determine "whether an AUC-based killing was a 'fact essential'" to the *sentencia*—a question which has to be answered in the affirmative for the document to satisfy the Rule 803(22) hearsay exception. *See id.* at 35–38.

Second, the district court found that "at best" the *sentencia* showed that Mr. Mangones "was charged with the homicide of John Doe 11." *Id.* at 38–39. It said the excerpts included contained no adjudicative findings by the tribunal as to any other specific homicide. The court reasoned that it could not "reasonably be inferred" by the *sentencia* or anything else in the summary judgment record that Mr. Mangones confessed to being responsible for the homicides listed in the *sentencia*. *See id.*

The district court mistakenly concluded that the *sentencia* was not admissible due to its own inability to determine whether the document concerned homicides by AUC members. The court's speculation about how the charges were brought disregarded the stated purpose of the Justice and Peace process, which as relevant here was to establish the responsibility of AUC members for certain crimes—a purpose the court seemingly accepted.

*See* D.E. 2551 at 5 n.4. The court did not cite any source for its uncertainty, other than a few vaguely worded sentences in the *sentencia*. This basis for exclusion was therefore mistaken. *See Arlook*, 952 F.2d at 374.

But the district court properly concluded that the *sentencia* was inadmissible for lack of adjudicative findings. Although the plaintiffs argue that the *sentencia* is admissible as a final judgment of conviction under Rule 803(22), the excerpts submitted to the district court surprisingly did not contain Mr. Mangones' actual conviction. Significantly, the excerpts discussed his charges, rather than his conviction on those charges. Indeed, the plaintiffs concede in their brief that they did "not submit th[e] portion of the judgment" with the adjudicative findings below. *See* Non-Wolf Plaintiffs' Initial Br. at 45–46.[15]

The plaintiffs argue that the other portions of the *sentencia* were not submitted to the district court only because the defendants first made the relevant hearsay argument in their supplemental response, to which they could not respond. The record, however, indicates that the plaintiffs were able to respond. Three weeks after the defendants filed their supplemental response, the plaintiffs submitted a motion *in limine* that discussed the admissibility of the *sentencia* but made no reference to the defendants'

---

[15] In addition, the table of contents of the *sentencia* indicated that some of the charges against Mr. Mangones were withdrawn by the government or dismissed by the court. *See* D.E. 2346-72 at 2.

hearsay argument. Maybe recognizing this reality, the plaintiffs now ask that we take judicial notice of the full content of the *sentencia*. We deny that request because "the taking of judicial notice of facts is, as a matter of evidence law, a highly limited process"; granting it here would "bypass[ ] the safeguards which are involved with the usual process of proving facts by competent evidence in district court." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997) (en banc).

Moreover, "[w]e cannot find an abuse of discretion based on our consideration of new evidence—evidence never considered by the [district] court . . . —on appeal." *United States v. Barton*, 909 F.3d 1323, 1335 (11th Cir. 2018). *See also Chapman v. AI Transp.*, 229 F.3d 1012, 1026 (11th Cir. 2000) (en banc) ("The rule is that a federal appellate court may examine *only* the evidence which was before the district court when the latter decided the motion for summary judgment.") (quotation marks omitted). "Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards." *Id.* at 1027.

## 2

The seven surviving children of José López 339 submitted an excerpt of the "First Instance Judgment" issued by the Superior Court of Medellin against Fredy Rendón Herrera for the murders of several individuals carried out by AUC members. The district court excluded this excerpt, and we conclude that it didn't abuse its discretion in doing so.

The district court explained that, based on the excerpt, it could not determine whether the "First Instance Judgment" was a "final" judgment, as required for admissibility under Rule 803(22). The court also stated that it was unable to determine "whether an AUC-based killing was a 'fact essential'" to the judgment because the plaintiffs "[did] not clearly show how command responsibility was assessed in the context of Colombian Justice and Peace Law proceedings." D.E. 2551 at 38. Finally, the court noted that the excerpt stated only that Mr. Rendón Herrera "was charged with the homicide of José López 339," but did not state that he was held "liab[le]" for it. *See id.* at 38–39. The excerpt did not contain adjudicative findings, and it could not be inferred from the face of the excerpt that Mr. Rendón Herrera confessed to responsibility for the homicides charged. *See id.* at 39. Thus, the court concluded that the excerpt was not admissible under Rule 803(22).

On this record, we cannot say that the district court abused its discretion in excluding the excerpt of the Rendón Herrera "First Instance Judgment." As the proponents of the evidence, the plaintiffs bore the burden of establishing that the judgment was admissible under a hearsay exception. *See generally United States v. Kennard*, 472 F.3d 851, 855–56 (11th Cir. 2006). The excerpt submitted to the court did not provide all of the requisite foundational information, and the plaintiffs failed to show that the document would be admissible at trial. The plaintiffs did not, for example, provide the court with translated portions of the document definitively showing that Mr. Rendón Herrera was convicted of the murder of

José López 339. Without such information, the plaintiffs failed to meet their burden of establishing the document's admissibility.

## D

Several plaintiffs argue that certain testimony should have been admitted under Rule 804(b)(3), the hearsay exception for statements against interest. We conclude that the testimony of John Doe 7 and José López 339's seven children should have been admitted, but that the testimony of Juana Doe 11 and Juana Pérez 43A was properly excluded.

Rule 804(b)(3) allows the admission of a statement, where the declarant is unavailable, that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it . . . had so great a tendency . . . to expose the declarant to civil or criminal liability." Whether a "statement is self-inculpatory or not can only be determined by viewing it in context. Even statements that are on their face neutral may actually be against the declarant's interest." *Williamson v. United States*, 512 U.S. 594, 603 (1994). Because we "do not read Rule 804(b)(3) to be limited to direct confessions of guilt," statements against interest include remarks that a reasonable person would have realized "strongly implied [the declarant's] personal participation" in the relevant crime. *See United States v. Thomas*, 571 F.2d 285, 288–89 (5th Cir. 1978) (quotation marks omitted). In fact, Rule 804(b)(3) "encompasses disserving statements by a declarant that would have probative value in a trial against the declarant." *Id.* at 288. Although the question of "whether a statement is against the

declarant's penal interest is purely a question of law subject to *de novo* review, consideration of a statement's trustworthiness requires a review of findings of fact and . . . of the [district] court's application of a legal standard to the facts." *United States v. Westry*, 524 F.3d 1198, 1215 (11th Cir. 2008) (citation omitted).

For Rule 804(b)(3) to apply, the declarant must be unavailable as a witness. *See United States v. Costa*, 31 F.3d 1073, 1077 (11th Cir. 1994). A declarant is unavailable if he "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure . . . the declarant's attendance or testimony." Fed. R. Evid. 804(a)(5)(B). "Whether a declarant is unavailable as a witness under Rule 804(a) is a question of law that we review de novo." *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1317 (11th Cir. 2013).

The burden of proving that the declarant is unavailable is on the statement's proponent. *See id.* The proponent must show that she exercised effort through process or reasonable means to attempt to locate the declarant and persuade him to come testify. *See United States v. Samaniego*, 345 F.3d 1280, 1283 (11th Cir. 2003) (holding that the proponent established that the declarant was unavailable through the testimony of his sister and mother, who explained that they tried and failed to contact him). That "foreign nationals located outside the United States are beyond the subpoena power of the district court," *id.* (cleaned up), does not mean that a proponent of the statement can do nothing to procure the declarant's attendance or testimony. *See United States v. Curbello*,

940 F.2d 1503, 1506–07 (11th Cir. 1991) (holding that the declarants, who were in a Bahamian jail, were not properly considered unavailable when the statements' proponent had not attempted to make them available).

A district court has discretion to "accept statements of parties or counsel as to unavailability of witnesses as a predicate to the use of depositions," *Castilleja v. S. Pac. Co.*, 445 F.2d 183, 186 (5th Cir. 1971), but it need not do so. And we have held that "counsel's uncorroborated statement" as to the reason for the declarant's unavailability is not sufficient on its own to satisfy the proponent's burden. *See United States v. Acosta*, 769 F.2d 721, 723 (11th Cir. 1985).

1

John Doe 7 is the father of John Doe 8, one of the decedents. John Doe 7 testified that a now-deceased AUC commander, Gilberto Camacho, made statements that incriminated himself and the AUC in the murder of John Doe 8. Specifically, John Doe 7 testified that when he confronted Mr. Camacho fifteen days after his son's death, Mr. Camacho did not deny killing his son. Instead, when John Doe 7 asked Mr. Camacho why he killed his son, Mr. Camacho answered that his son "was full of vices," such as smoking and drugs. *See* Non-Wolf Plaintiffs' Initial Br. at 72–73 (quoting D.E. 2348-50 at 12).

The district court excluded this testimony because it found that John Doe 7 did not provide evidence that Mr. Camacho's

statement linked John Doe 8's murder to the AUC.  The court explained that Mr. Camacho did not "take responsibility" for the murder or attribute it to an AUC operative, so his statement did not qualify as a statement against penal interest under Rule 804(b)(3). See D.E. 2551 at 59.  The court emphasized that although John Doe 7 testified that Mr. Camacho was an AUC leader he "did not explain a basis for this belief, based on personal knowledge," nor did he "identify a source of evidence in the record establishing an affiliation between [Mr.] Camacho and the AUC." Id.

We conclude that the district court erred in ruling that the statement to John Doe 7 was not against Mr. Camacho's penal interest.  A reasonable person would realize that, by explaining why a crime was committed, a declarant who is questioned implies that he personally participated in or was involved in that crime.  By answering John Doe 7's question in the way he did, Mr. Camacho implied or suggested that he was involved in John Doe 8's murder. His statement was therefore against his penal interest.  See Thomas, 571 F.2d at 288–89 (holding that a witness' statement that the defendant "didn't have anything to do with [the robbery]" and should be let go was against the witness' penal interest).

The district court also erred in concluding that John Doe 7 did not sufficiently explain the basis for his belief that Mr. Camacho was affiliated with the AUC.  The affidavit which John Doe 7 filed under seal, and to which the district court referred, contains more than simply a "suggesti[on]" that the AUC was active in the relevant community and recognizable by its weapons.  See D.E. 2551

at 59. In his affidavit, John Doe 7 explained that he knew Mr. Camacho was an AUC member because they had worked together before and because Mr. Camacho went, armed, to local meetings run by self-proclaimed AUC members. *See* Non-Wolf Plaintiffs' Initial Br. at 75 (discussing D.E. 2348-129). For the purposes of admissibility, these facts provide a sufficient basis for John Doe 7's belief.

In sum, John Doe 7 sufficiently explained his basis for believing that Mr. Camacho was an AUC commander. And because Mr. Camacho's statement to John Doe 7 is admissible under Rule 804(b)(3) as a statement against interest, the district court erred in excluding it.

## 2

Juana Doe 11 also argues that her own testimony should not have been excluded. She testified that she heard an AUC commander, Mr. Mangones, confess to killing her husband via the audio given to her by the state attorney on CD. She also attended Mr. Mangones' hearing and personally asked him if he had killed her husband. Mr. Mangones responded by confessing to the murder. *See* D.E. 2348-38 at 57. On this record, we conclude that the district court did not err.

The district court ruled that this testimony was inadmissible because Juana Doe 11 did not show that Mr. Mangones was unavailable as required by Rule 804(b)(3). The court found that her statement that the Colombian government did not allow Mr.

Mangones to be deposed until March of 2019 was not sufficient to show that he was unavailable. The deposition never took place because the discovery cut-off date was October 18, 2018, and the court ordered that the scheduled deposition be cancelled.

In its order, the district court discussed the discovery history of the case as it related to Mr. Mangones to further explain its decision. In December of 2014, the plaintiffs filed an emergency motion to take Mr. Mangones' deposition (as well as the depositions of two other paramilitary members who were also in custody in Colombia). The court first granted the motion and issued Letters of Request pursuant to the Hague Evidence Convention in March of 2015, and then in a requested modified form in April of 2015. In June of 2018, the plaintiffs asked for a second set of Letters of Request because the Colombian government never produced Mr. Mangones and had returned the 2015 Letters of Request. Juana Doe 11 said that it was "unclear" why the Colombian authorities responded as they did, but the court faulted her for not explaining what she was doing to solve the problem and depose Mr. Mangones between April of 2015 and June of 2018. The court noted that if the delay had been a strategic decision by Juana Doe 11 (because of Mr. Mangones' potential status as a "tainted" witness due to alleged "corruption and collusion" with an attorney in a "witness payment scandal"), then Mr. Mangones was not unavailable.

The district court did not err in concluding that Juana Doe 11 failed to show that Mr. Mangones was unavailable under Rule 804(a). The only support she provided was the fact that Mr.

Mangones was in custody in Colombia and that she had obtained and sent the 2015 Letters of Request to the Colombian government.

Juana Doe 11 says that she did "everything possible" so that the Colombian authorities would schedule the deposition quickly, and that she had no control over their actions and did not know why they did not move expeditiously. But she provided no testimonial or documentary evidence regarding her communications with the Colombian authorities or any other efforts she made in order to procure Mr. Mangones' testimony—other than that she was granted the Letters of Request in the district court—before the discovery cutoff. And that was insufficient. *See Acosta*, 769 F.2d at 723 (holding that counsel's uncorroborated statements about unavailability were not sufficient, by themselves, to show that the witness was unavailable). *See also Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1048 (9th Cir. 2018) (explaining that unavailability cannot be established by asserting that "counsel made reasonable, good faith efforts to procure the witness's presence" if she "fail[s] to explain what those efforts were" and lacks "any evidence of actual reasonable, good faith efforts").

We recognize that litigants in the United States have no control over whether and when foreign governments will permit depositions of incarcerated individuals. And we might have viewed the situation here differently if there was some evidence that Juana Doe 11 or her counsel had followed up with the Colombian

42                    Opinion of the Court                    19-13926

authorities in 2016, 2017, or 2018 to find out what was going on. Unfortunately for Juana Doe 11, the record is silent on this score.

**3**

Juana Pérez 43A also submitted her own testimony. She testified that she learned that Mr. Mangones confessed to being responsible for her son's death. But she admitted that Mr. Mangones was not present when she learned of his confession. Although she had seen Mr. Mangones at a hearing, she did not recall anything he said at that hearing.[16]

The district court excluded this testimony for two reasons. First, Juana Pérez 43A did not show that Mr. Mangones was unavailable within the meaning of Rule 804(a)(5). Second, she was not competent to testify as to Mr. Mangones' confession because she did not personally hear it.

As with Juana Doe 11, the district court did not err in ruling that Juana Pérez 43A did not establish that Mr. Mangones was unavailable under Rule 804(a)(5). Nor did the court err in excluding her testimony about the confession. She was not competent to

---

[16] Although Juana Pérez 43A argues that she attended the hearing where Mr. Mangones took responsibility for killing her son, she admits that her "testimony on this point is ambiguous." Non-Wolf Plaintiffs' Initial Br. at 96–97. Nevertheless, she asserts that the district court erred in not drawing the reasonable inference that she was present. We disagree because she explicitly stated that Mr. Mangones was not present when she was at the Justice and Peace hearing and that that is where she learned of his confession.

testify about the content of the confession because her testimony was not based on personal knowledge. *See* Fed. R. Evid. 602; *Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1250 (11th Cir. 2007).[17]

**4**

The seven children of decedent José López 339 contend that Mr. Rendón Herrera, the AUC leader responsible for their father's death, personally apologized to them for the murder. *See* D.E. 2511-1 at 16. Two months after their father's death, the family was summoned to a meeting with an AUC commander. *See* D.E. 2348-94 at 16–17. Mr. Rendón Herrera had called the meeting to ask for the children's forgiveness for the murder of their father. *Id.* He told them that he had killed their father based on mistaken information. *See id.* at 17–18.

In supplemental briefing ordered by the district court, the children argued that Mr. Rendón Herrera's out-of-court statement was admissible as a statement against penal interest under Rule 804(b)(3). To that end, they asserted that Mr. Rendón Herrera was unavailable because they had been unable to procure his deposition by "reasonable means." *See* Fed. R. Evid. 804(a)(5).

The district court determined that Rule 804(b)(3) was inapplicable because the children had failed to show that Mr. Rendón

---

[17] Juana Pérez 43A also testified that, on the morning of her son's murder, she noticed a young man following him to work and heard shots. The district court did not address this portion of her testimony, so we assume it was not excluded.

Herrera was unavailable.  The court also excluded his "alleged confession" because it "[did] not create a triable issue of fact on the identify of José López 339's killers."  D.E. 2551 at 58.

Courts require a "bona fide effort[ ] to obtain" the appearance or testimony of a witness. *See* 30B Jeffrey Bellin, Fed. Prac. & Proc.: Evid. at § 6968 (2022).  If a witness resides in another country, one "reasonable solution" is to seek his deposition. *See United States v. Kelly*, 892 F.2d 255, 262 (11th Cir. 1989).  As we explain, the district court abused its discretion in excluding the children's testimony because the plaintiffs had, in fact, attempted but twice failed to depose Mr. Rendón Herrera in Colombia.

Pursuant to Letters of Request issued under the Hague Evidence Convention, the plaintiffs were permitted to schedule two depositions of Mr. Rendón Herrera.  The first deposition was scheduled while he was still in prison.  The plaintiffs' counsel traveled to Colombia and appeared at the scheduled deposition.  Mr. Rendón Herrera, however, had been released from prison two weeks before the deposition, sent his attorney to the wrong court, and did not appear. *See* D.E. 1798 at 8; D.E. 2346-98 at 17.  The second deposition, also in Colombia, was scheduled after Mr. Rendón Herrera did not show up for the first, but he also failed to appear for the second. *See* D.E. 2551 at 55 n.35 (acknowledging that Mr. Rendón Herrera twice failed to appear for deposition).  So the plaintiffs were unable to depose Mr. Rendón Herrera despite having twice scheduled his deposition and traveled to Colombia.  These two failed depositions show that the plaintiffs employed a

reasonable means of attempting to procure Mr. Rendón Herrera's testimony. These scheduled depositions "constituted a good-faith effort that was reasonable under the . . . circumstances of this case." *United States v. Smith*, 928 F.3d 1215, 1231 (11th Cir. 2019). *Cf. Samaniego*, 345 F.3d at 1283 ("Using the efforts of [the foreign witness'] sister and mother . . . is a reasonable means of attempting to locate [the witness] in Panama and persuade him to travel to the United States to testify.").

In sum, there was sufficient evidence in the record of Mr. Rendón Herrera's unavailability. The district court therefore erred when it excluded the testimony of José López 339's children.[18]

E

Rule 803(2) permits the introduction of statements "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." The "basis for the 'excited utterance' exception . . . is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation." *Idaho v. Wright*, 497 U.S. 805, 820 (1990).

> While the declarant must still be under the stress or excitement that the startling event caused, the excited utterance need not be made contemporaneously to

---

[18] To the extent that the district court excluded the testimony because it did not create a triable issue on the identity of José López 339's killer, we address the sufficiency of the evidence in Part III.F.

the startling event. It is the totality of the circumstances, not simply the length of time that has passed between the event and the statement, that determines whether a hearsay statement was an excited utterance.

United States v. Belfast, 611 F.3d 783, 817–18 (11th Cir. 2010) (holding that the district court did not abuse its discretion in admitting, as excited utterances, statements made by a person four to five hours after he was tortured).

Two plaintiffs, Gloria Eugenia Muñoz and Jane Doe 7, argue that certain evidence was admissible under Rule 803(2)'s hearsay exception for excited utterances. We conclude that the testimony offered by Ms. Muñoz and Jane Doe 7 was properly excluded for various reasons.

## 1

Ms. Muñoz sought to introduce testimony regarding the circumstances of the death of her son, Miguel Angel Cardona. At her deposition, Ms. Muñoz testified that her daughter-in-law, Onelsi Mejía, told her that two men came into her house and kidnapped Mr. Cardona (who was then her brother-in-law). See D.E. 2348-36 at 13–14. Ms. Muñoz was not at the house at the time of the kidnapping, and she did not testify about either the timing of Ms. Mejía's statements to her about the abduction or Ms. Mejía's mental state at the time.

19-13926               Opinion of the Court                    47

The district court excluded Ms. Mejía's statements to Ms. Muñoz, finding that there was no temporal link in the record between when Ms. Mejía witnessed Mr. Cardona's abduction and when she told Ms. Muñoz about the abduction. *See* D.E. 2551 at 49–50. Based on that deficiency, the court stated that there was "no predicate for admission of the statement [as an excited utterance under Rule 803(2)] as one made while [Ms. Mejía] 'was under the stress of excitement' caused by the kidnapping." *Id.* at 50.

On appeal, Ms. Muñoz does not dispute the district court's basis for excluding Ms. Mejía's statement to her. Rather, she argues that she "could testify at trial that [Ms. Mejía's] statements were excited utterances." Non-Wolf Plaintiffs' Initial Br. at 101. The problem for Ms. Muñoz is that, as the proponent of Ms. Mejía's statements, she "ha[d] the burden of demonstrating" that they were excited utterances. *See* 5 Weinstein's Fed. Evid. at § 803.04[1]. If Ms. Muñoz had information about the temporal link, she was required to provide it to demonstrate an excited utterance. The mere possibility that she could testify at trial and potentially lay the foundation for the admissibility of Ms. Mejía's statements as excited utterances does not demonstrate an abuse of discretion and is insufficient to defeat a motion for summary judgment. *See Jones*, 683 F.3d at 1294 (the possibility that the declarant may testify differently "amounts only to a suggestion that admissible evidence might be found in the future, which is not enough to defeat a motion for summary judgment") (internal quotation marks and citation omitted). Given the total lack of evidence in the record

regarding the timing and circumstances of Ms. Mejía's statements relative to Mr. Cardona's abduction, the court properly concluded that the statements were not admissible as excited utterances under Rule 803(2).

## 2

Ms. Muñoz also argues that the testimony of her other son, Roberto Muñoz, should have been admitted as an excited utterance under Rule 803(2). Roberto filed a declaration in which he admitted that he did not witness his brother's kidnapping but recounted that Ms. Mejía—his wife at the time—had told him she witnessed the kidnapping. Roberto also stated that he confronted the two men who Ms. Mejía said kidnapped his brother—*El Muelon* and *El Tripilla*—and "asked them what they had done with [his] brother." D.E. 2346-106 at 2. Roberto recounted that "[a]t first they denied that they knew what I was talking about but after admitting [sic] they had left [my brother] at the entrance of a farm called La Represa." *Id.* He explained that he then found his brother dead at that farm. *See id.* He believed that the two men were AUC members because "[t]hey were recognized by the inhabitants of the area" and "when they committed crimes [they] identified themselves as AUC or paras." *Id.*

The district court excluded Roberto's testimony regarding Ms. Mejía's description of the kidnapping. The record did not reveal the timing or context of Ms. Mejía's statements to Roberto, and as a result there was no basis on which to find that they were excited utterances under Rule 803(2). The court additionally ruled

that, even if the statements were excited utterances, Ms. Mejía's identification of the killers was not admissible because it was based on what "other witnesses" had told her, rather than her own personal knowledge. It explained that Ms. Mejía's "state of mind is only reliable evidence of the truth of what she actually witnessed—not the names or criminal affiliations of the abductors with whom she was unfamiliar." D.E. 2551 at 51.[19]

As with Ms. Muñoz, the district court did not err in ruling that Ms. Mejía's statements to Roberto were inadmissible as excited utterances. Simply stated, there was no information as to the circumstances or timing of Ms. Mejía's statements relative to the kidnapping. Thus, we need not and do not address Ms. Mejía's identification of the suspected murderers.

As for Roberto's testimony about his confrontation with *El Muelon* and *El Tripilla*, the district court excluded it because "there is no admissible evidence from which their alleged AUC affiliation may reasonably be inferred." *Id.* The court found Roberto's translated comment that "when they committed crimes [they] identified themselves as AUC or paras" to be "incomprehensible." *Id.* The court also ruled that his statement that the men were recognized

_____

[19] Although Ms. Mejía witnessed the kidnapping, she did not know at the time who the kidnappers were. She only later came to learn the identity of the kidnappers, and their status as AUC members, from other witnesses in the community who identified the men and told her their aliases. *See* D.E. 2551 at 50 & n.33 (quoting D.E. 2345-106 at 4).

by other people in the area was inadmissible because it was not based on personal knowledge. *See id.*

Generally, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Although we do not think Roberto's statement about the confrontation was "incomprehensible," the district court did not abuse its discretion in excluding it or the rest of Roberto's testimony. *See Corwin*, 475 F.3d at 1250 ("Because a court is not required to accept as true testimony that is not based on personal knowledge and because none of this excluded testimony was based on personal knowledge, the district court did not abuse its discretion in disregarding this testimony."). The court reasonably concluded that Roberto did not provide enough information to show that he knew that the men were AUC members based on his personal knowledge, rather than what he was told by others. That is particularly so considering that the full sentence in Roberto's declaration alludes to the knowledge of others: "[*El Muelon* and *El Tripilla*] were recognized by the inhabitants of the area, they, [sic] when they committed crimes identified themselves as AUC or paras." D.E. 2346-106 at 2.[20]

---

[20] We do not consider whether Roberto's declaration is admissible under any other hearsay exception because Ms. Muñoz declines to make any such arguments.

### 3

Jane Doe 7 sought to introduce her deposition and affidavit testimony, which in summary was as follows. The AUC had a list with the names of certain banana workers, set up checkpoints near the banana plantations, and often killed those whose names were on the list. One night, two coworkers of John Doe 11—Jane Doe 7's husband—allegedly told him that earlier in the day they had been stopped at a checkpoint and that his name had been read aloud. The coworkers also said that the AUC had killed two other workers who were on the list that day. Before he was killed, John Doe 11 told Jane Doe 7 all of this. Aside from saying that John Doe 11's statements to her came "afterwards," Jane Doe 7 did not specify how much time elapsed from the time the coworkers spoke to John Doe 11 to the time he relayed the information to her. Nor did Jane Doe 7 say anything about John Doe 11's mental state.

The district court excluded Jane Doe 7's testimony, concluding that the statement from John Doe 11 did not qualify as an excited utterance because the statement was "made at some indeterminate point 'afterwards.'" DE 2551 at 45–46. Based on the record before us, the court did not abuse its discretion in excluding Jane Doe 7's testimony. There are at least two layers of hearsay here— (1) the statements of John Doe 11's coworkers to John Doe 11, and (2) John Doe 11's statements to Jane Doe 7. *See Crawford*, 977 F.3d at 1348 ("If a statement contains multiple levels of hearsay, each level must satisfy an exception to the hearsay rule."). Assuming that the coworkers' statements to John Doe 11 were excited

utterances, there is still a hearsay problem with John Doe 11's later statement to Jane Doe 7.

As noted, Rule 803(2) requires that, to qualify as an excited utterance, a statement be "made while the declarant was under the stress of excitement" caused by an event or condition. The mere existence of a stressful event is insufficient; "the declarant must *still be* under the stress or excitement that the startling event caused" when making the statement. *See Belfast*, 611 F.3d at 817 (emphasis added). The statement must have been "spontaneous, excited, or impulsive as required by Rule 803(2) rather than the product of reflection and deliberation." *United States v. Lawrence*, 699 F.2d 697, 704 (5th Cir. 1983).

We look at the "totality of the circumstances" in order to determine whether a hearsay statement was an excited utterance. *See Belfast*, 611 F.3d at 817. The record here, however, is completely silent as to whether John Doe 11 was still under the stress of excitement caused by his coworkers' statements when he spoke to Jane Doe 7. As a result, it was not an abuse of discretion for the district court to exclude Jane Doe 7's testimony.

F

We now turn to the expert evidence offered by the plaintiffs. Based on the district court's order and the parties' arguments on appeal, there are three categories of evidence in play: (1) statistical data relating to AUC/paramilitary patterns of violence in relevant geographic areas of Colombia; (2) *modus operandi* evidence,

which consists of typical markers or indicators of AUC murders; and (3) the experts' ultimate conclusions of AUC involvement/responsibility in the murders of the bellwether decedents based on interpretations of relevant evidence.

1

The Wolf plaintiffs and the defendants assume that the district court excluded the testimony of the plaintiffs' experts, Oliver Kaplan (for the Non-Wolf plaintiffs) and Manuel Ortega (for the Wolf plaintiffs), in full pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See* Wolf Plaintiffs' Initial Br. at 21–37; Appellees' Answer Br. at 41–51. Our review of the court's order, however, indicates otherwise. *See* Non-Wolf Plaintiffs' Initial Br. at 65–71 (asserting that the district court "did not exclude [Mr.] Kaplan's evidence and conclusions concerning the AUC's activities" but did exclude his ultimate opinion "that the AUC was 'more likely than not' responsible for the deaths of [the] decedents").

In its order, the district court separated the expert evidence and testimony into at least two categories. *See* D.E. 2551 at 63, 67. It then treated these categories of evidence differently. Notably, the order is pretty clear about what was ruled inadmissible, and much of the evidence the plaintiffs sought to introduce through their experts was not excluded.

One such category of expert evidence is what the district court termed "[g]eographical and [t]emporal [e]vidence." *See id.*

at 63. This evidence consisted of statistical data relating to AUC and paramilitary patterns of violence in the relevant regions of Colombia, which was compiled by the plaintiffs' experts. *See id.* at 63–65.

The district court engaged with this evidence on the merits and laid it out in detail. *See* D.E. 2551 at 63–67. After considering the evidence, the court concluded that it was "simply far too speculative, standing alone, to permit a reasonable juror to conclude, more likely than not, that the death of any decedent was linked to an AUC operation." *Id.* at 66. But the court did not state, much less rule, that any of this geographical and temporal evidence was inadmissible for one reason or another.

In a separate section of its order, titled "Expert Opinions," the district court ruled that the *ultimate* opinions of both experts on causation were inadmissible under Rule 702. *See id.* at 67–68. It excluded those opinions because "neither [expert was] applying specialized knowledge or 'reliable' methodologies." *Id.* at 68. Significantly, the court clarified that it was not expressing any opinion as to the defendants' hearsay objections to the statistical data (the geographic and temporal evidence) the experts had compiled and included in their reports. *See id.* at 68. *See generally Bauman v. Centex Corp.*, 611 F.2d 1115, 1120 (5th Cir. 1980) ("The pertinent inquiry . . . is whether the facts are of a type reasonably relied on by experts in the particular field."). We proceed, then, on the understanding that the statistical data evidence was not excluded at summary judgment.

The district court reasoned that the manner in which the experts formed their opinions—"simply collect[ing] historical crime war statistics" as a basis for deducing an AUC connection to the victims' deaths—did not satisfy the requirements of the Federal Rules of Evidence. *See* D.E. 2551 at 68. "[N]either [expert] applied 'a reliable methodology' to form the proffered opinions on the 'likelihood' of AUC involvement"; nor did the experts "demonstrate how their prior experience or 'specialized knowledge' was relevant to the making of the proffered 'deductions' on the likelihood of AUC involvement." *Id.*

**2**

The principles set out in *Daubert* apply to soft-science expert testimony. "Social science testimony, like other expert testimony . . . , must be tested to be sure that the person possesses genuine expertise in a field and that her court testimony adheres to the same standards of intellectual rigor that are demanded in her professional work." *Tyus v. Urb. Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996) (alteration, internal quotation marks, and citation omitted). *See also Wessmann v. Gittens*, 160 F.3d 790, 805 (1st Cir. 1998) ("When scientists (including social scientists) testify in court, they must bring the same intellectual rigor to the task that is required of them in other professional settings.") (citations omitted).

That said, "social science research, theories[,] and opinions cannot have the exactness of hard science methodologies," and "peer review, publication, error rate, etc. are not applicable to this kind of testimony, whose reliability depends heavily on the

56                    Opinion of the Court                    19-13926

knowledge and experience of the expert." *United States v. Joseph*, 542 F.3d 13, 21 (2d Cir. 2008) (alteration, internal quotation marks, and citations omitted), *abrogation recognized as to another issue in United States v. Waqar*, 997 F.3d 481 (2d Cir. 2021). Where "ideal experimental conditions and controls" are precluded, "other indicia of reliability are considered under *Daubert*, including professional experience, education, training, and observations." *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) (citation omitted). *See also United States v. Young*, 916 F.3d 368, 380–81 (4th Cir. 2019) (affirming the admission of expert testimony on extremist groups based on a "social sciences-based methodology," which involved a comparative method which focused on primary sources and then compared conclusions "against secondary sources and ʻevents on the groundʼ"); *United States v. Hammoud*, 381 F.3d 316, 336–38 (4th Cir. 2004) (affirming admission of social science testimony on Hizballah from an expert who previously worked with the FBI, and who now worked at a think tank where he specialized in Middle Eastern terrorist groups), *judgment vacated on other grounds by Hammoud v. United States*, 543 U.S. 1097 (2005). Where appropriate, social science expert testimony can give "the jury a view of the evidence well beyond their everyday experience." *Tyus*, 102 F.3d at 263.

### 3

We begin with Mr. Kaplan. Although not dispositive, we briefly detail his credentials and expertise, which have not been questioned. Mr. Kaplan is an associate professor at the Josef Korbel

School of International Studies at the University of Denver, where he has lectured since 2012. *See* D.E. 2348-4 at 4, 54. He is also the associate director of the Korbel School's Latin America Center. *See id.* at 54. Prior to joining the Korbel School, Mr. Kaplan did post-doctoral work at Stanford University and Princeton University performing empirical studies of conflict. *See id.* He "is an expert on Colombian politics and armed conflict in Colombia." *Id.* at 4. He has visited Colombia between twenty and thirty times, has "conducted extensive fieldwork [there]," and has had that research published. *See id.* at 4; App. 4914. He authored a book titled "Resisting War: How Communities Protect Themselves," "which examines how civilian communities organize to protect themselves from wartime violence in Colombia and other countries." *Id.* He has also done "a lot of background reading on the country and the conflict," "analyzed a number of different data sets related to Colombia," and "interviewed people and had informal conversations with people from the country about the country." *Id.* Additionally, he is part of a "broad[ ] academic community of scholars that work on Colombia and exchange information . . . [and] research." *Id.*

In reaching his opinion, Mr. Kaplan relied on several categories of information, including (1) the "temporal overlap" of the violence against bellwether victims and the "general patterns of AUC violence," D.E. 2348-4 at 41–42; (2) the consistency of the geographic patterns of the bellwether victims' cases compared with the geographic spread of crimes committed by paramilitary groups, *see id.* at 41; and (3) the statistical data regarding killings and massacres

in the bellwether victims' municipalities during the relevant time period, *see id.* at 40–41.  Using Colombian sources and information, Mr. Kaplan opined that "almost all (90 percent) of the killings of civilians in the bellwether victims' municipalities during the timeframe of this case were committed by paramilitaries."  *Id.* at 41.[21]

Given the three categories of information summarized above, the district court excluded Mr. Kaplan's ultimate opinion. *See* D.E. 2551 at 63–69.  If that were everything that Mr. Kaplan had relied on in reaching his opinion, we might have affirmed the district court's ruling as not an abuse of discretion.  But these three categories were only a portion of the data and information on which he relied.

Mr. Kaplan considered and relied on at least three other categories of information to reach and support his conclusion.  First, he provided a history of the AUC, explained its rise to power, and detailed the group's motives and the reasons behind its use of violence, chosen crimes, and infliction of widespread terror.  *See* D.E. 2348-4 at 7–28.  Second, he described the *modus operandi* of the AUC, both generally and as it pertained to the bellwether decedents.  He stated that the AUC targeted political enemies, banana workers, and unionists, often using lists of names to identify its

---

[21] According to Mr. Kaplan, 6,101 of the 6,792 murders in the decedents' municipalities in the relevant time period were committed by paramilitaries.  *See* D.E. 2348-4 at 43 & fig. 7.4.

victims. *See id.* at 26. He detailed some of the methods the AUC used to target and kill victims, including driving white or grey cars, taking people off of buses, and torturing and decapitating victims. *See id.* at 46. Third, Mr. Kaplan corroborated the plaintiffs' accounts of each of the murders, providing information as set out in "news sources, NGO reports, paramilitary testimonies . . . , and human rights violation and armed conflict datasets." *Id.* at 47. For example, as to John Doe 11 Mr. Kaplan verified through a Colombian database that he had been killed in a manner "consistent with the information registered by [his] family member plaintiffs." *Id.* Specifically, he confirmed that John Doe 11 had been "executed . . . with four gunshots" "at the urban perimeter of the town center" by "[p]aramilitaries who covered their faces with ski masks and [were] riding a high-cylinder motorcycle." *Id.*

Using all of that information, Mr. Kaplan opined that "[m]any if not all of the human rights violations against the bellwether victims in this case were *caused* by the AUC paramilitaries." *Id.* at 52. He expressly stated that his conclusion was "supported by similar *modus operandi*, timing and geography, . . . the general patterns of violence committed by the AUC[,] . . . [and] direct verification of bellwether victim cases and their details via human rights violation and conflict databases and paramilitary testimonies that confess to the murders." *Id.*

The Non-Wolf plaintiffs cite to three cases in support of their argument that the district court erred in excluding Mr. Kaplan's ultimate opinion—*Boim v. Holy Foundation for Relief &*

60                    Opinion of the Court                    19-13926

Development, 549 F.3d 685 (7th Cir. 2008) (en banc); Acosta v. Islamic Republic of Iran, 574 F. Supp. 2d 15 (D.D.C. 2008); and Blais v. Islamic Republic of Iran, 459 F. Supp. 2d 40 (D.D.C. 2006). These out-of-circuit cases are not dispositive, but they do address similar expert testimony.

In Boim, the family of a murder victim sued various entities alleging that the murder had been committed by Hamas, which had been aided by the defendants' support. See 549 F.3d at 687–88. The expert, hired "[t]o show that the murder of David Boim was the work of Hamas," was permitted to opine that the murder had been committed by members of Hamas based on his review of case exhibits, independent research, and "knowledge of how Hamas and other Islamic terror organizations operate." Id. at 702. The Seventh Circuit, sitting en banc, concluded that the district court had not abused its discretion in permitting the expert to testify even though he may have relied on some inadmissible evidence to reach his ultimate opinion. See id. at 704–05.

In both district court cases, Acosta and Blais, the plaintiffs' experts were allowed to opine as to the causal link between the terrorist group at issue and the defendant(s) in the case, based on data and information similar to that relied upon by Mr. Kaplan. See Acosta, 574 F. Supp. 2d at 22–23 (permitting two experts to opine that Iran had provided support to a particular terrorist organization "based upon publicly available sources including the State Department's 1992 Patterns of Global Terrorism, . . . and a number of different public articles reporting Iranian training and financial

19-13926              Opinion of the Court                  61

support" of the group during the relevant time period); *Blais*, 459 F. Supp. 2d at 49 (allowing expert to testify that a particular terrorist attack would not have happened without Iranian support, an opinion which was based "on publicly available sources that were not inconsistent with classified information known to him," including congressional testimony and "articles published by the Federation of American Scientists as well as the Free Muslims Coalition"). Although none of these cases compel reversal here, they are persuasive and lead us to conclude that Mr. Kaplan's opinion is admissible. Significantly, the defendants have not cited to any decisions excluding this type of expert testimony or opinion.

Individually, the additional categories of data and information relied on by Mr. Kaplan, which the district court failed to consider, might not have required reversal under the abuse of discretion standard. Taken together, however, they provide further support for Mr. Kaplan's conclusion and lead us to a different result concerning admissibility. Given the full universe of information on which Mr. Kaplan relied, the court abused its discretion in excluding his opinion. *See United Fire & Cas. Co. v. Whirlpool Corp.*, 704 F.3d 1338, 1341–42 (11th Cir. 2013) (reversing the exclusion of a portion of an expert's testimony because the district court had failed to consider the evidence supporting that opinion); *United States v. Ala. Power Co.*, 730 F.3d 1278, 1284–88 (11th Cir. 2013) (holding that the exclusion of an expert constituted an abuse of discretion because the district court mischaracterized the evidence supporting the expert's opinion).

4

We turn next to Mr. Ortega, a former special agent with the FBI.  Prior to his retirement in 2012, he was involved in the FBI's investigation of Chiquita's payments to the AUC.  *See* D.E. 2325-4 at 3.  As a special agent, Mr. Ortega "received training on" and investigated "the identity of groups that conducted kidnapping[s] and murders of American citizens in Colombia."  *Id.*  He has "significant on-the-ground experience in Colombia, having traveled extensively across the country."  *Id.* at 4.  Presently, Mr. Ortega works in private sector security consulting, which "involves teaching and advising private clients in Latin American countries how to detect risks associated with exposure to terrorist groups."  *Id.* at 5.

Like Mr. Kaplan, Mr. Ortega examined temporal, geographical, and circumstantial evidence to opine that the violent crimes committed against the six victims (including the two Wolf plaintiffs' decedents) he was hired to evaluate "were probably all committed by the paramilitaries."  D.E. 2325-4 at 6.  He considered the locations where the murders took place relative to AUC-controlled territories, the circumstances of the murders, and the statistics of murders committed in the Urabá region of Colombia.  *See id.* at 2. One piece of data was that between 1981 and 2012, 38% of "selective assassination[s]" in all of Colombia were committed by paramilitaries.  *See id.* at 17.  Another was that "[t]he paramilitaries were responsible for the vast majority of the murders in Urab[á]" from 1995 to 1997.  *Id.* at 16.  The latter statement, however, was based on a contention by Wolf plaintiffs' attorney, who told Mr.

Ortega that "although he [had] accepted cases of victims of both the paramilitaries and guerillas for approximately a ten-year period each, over 90% of the [2,000] cases he investigated were committed by the paramilitaries." *Id.* at 16–17.[22]

The record on appeal does not contain an unredacted version of Mr. Ortega's expert report. As such, there is information and reasoning in it to which we do not have access. It was the Wolf plaintiffs' responsibility to perfect the appellate record and ensure review of the relevant portions of the report. *See, e.g., United States v. Gutierrez*, 931 F.2d 1482, 1491 (11th Cir. 1991) ("It is elementary that appellants must perfect the record so as to support the issues which they present on appeal."). The report is labeled as highly confidential and was filed under seal in the district court, but the Wolf plaintiffs could and should have filed an unredacted version under seal in this court. *See* 11th Cir. R. 25-3(h), 25-5; *Gutierrez*, 931 F.2d at 1491. We would be hard-pressed to reverse the district court's rulings regarding Mr. Ortega when nearly half of his report is unavailable for our review and consideration. For the sake of completeness, however, we address the arguments of the Wolf plaintiffs as to admissibility.

Mr. Ortega explained that his methodology consisted of his "training    and    experience    investigating    terrorism,

---

[22] In the portions of Mr. Ortega's report that we were able to review—more on that in a moment—there were no other statistics relevant to the Wolf plaintiffs' cases.

[k]idnapping/murders, and [d]rugs over the course of [his] career as a Special Agent in the FBI and as a private consultant." *Id.* at 6. His investigative experience included interviewing former and incarcerated AUC members to determine the amounts paid by Chiquita to the AUC. *See id.* at 4.

The Wolf plaintiffs argue that Mr. Ortega, unlike Mr. Kaplan, was an experiential expert—an expert qualified based on his experience rather than formal education or academics. Even if that is so, that fact alone is not enough to show an abuse of discretion by the district court. Although it is true that "an expert may be qualified by experience, . . . experience, standing alone, is [not] a sufficient foundation rendering reliable *any* conceivable opinion the expert may express." *Frazier*, 387 F.3d at 1261. If an expert "is relying solely or primarily on experience, then [he] must explain *how* that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* (quoting Fed. R. Evid. 702 advisory committee note, 2000 Amendment). So proponents of experience-based expert opinions (like those involving social science) must put forth sufficient indicia of reliability *and* demonstrate that the expertise permits the opinion(s) rendered. *See Tyus*, 102 F.3d at 263 (the *Daubert* framework applies to "social science experts, just as it applies to experts in the hard sciences," though "the measure of intellectual rigor will vary by the field of expertise and the way of demonstrating expertise will also vary").

Although Mr. Ortega satisfied these foundational require-ments with regard to his general expertise, the Wolf plaintiffs still cannot show an abuse of discretion. The reason is that there is an "analytical gap" between the data on which Mr. Ortega relied and his ultimate opinion that six victims, including the decedents of Doe 378 and Doe 840, were probably killed by the AUC. *See Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997). Mr. Ortega never ex-plained "*how* his experience . . . supported his opinion." *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1329 (11th Cir. 2014).

Despite not having reviewed any police or autopsy reports for any of the decedents, and acknowledging that 38% of "selective assassination[s]" in all of Colombia were committed by paramili-taries (including, but not limited to, the AUC), Mr. Ortega con-cluded that the six decedents were probably killed by the AUC. *See* D.E. 2325-4 at 6, 17. How Mr. Ortega jumped from the 38% figure to his ultimate opinion is not clear. Mr. Ortega said that "when territorial control is considered, the vast majority of these crimes [the selective assassinations by paramilitaries] were committed by the group in control," and that "[i]t would be highly unlikely for local bandits or groups of common criminals to operate in an area controlled/protected by the AUC." D.E. 2325-4 at 15, 17. He also noted that the relevant towns "were controlled by the AUC be-tween 1995 and 1997, the range of dates of the cases reviewed." *Id.* at 15.

Even so, Mr. Ortega didn't explain how his experience or sources led to or supported the conclusion he reached. First, he

offered nothing to support the conclusory statement that the "vast majority" of the 38% of murders—which is necessarily less than 50% of the murders in Colombia—were committed by the group in control.  In contrast to some of his other data points, he did not cite to any authority for this statement.  *See id.* at 15–16.  Instead, the report indicated that this conclusion came from the statements of counsel for the Wolf plaintiffs, who hired Mr. Ortega.  *See id.* at 16–17 ("According to Plaintiffs' counsel Paul Wolf, although he accepted cases of victims of both the paramilitaries and guerillas for approximately a ten-year period each, over 90% of the [2,000] cases he investigated were committed by the paramilitaries.").

Under Rule 703, an expert may rely on inadmissible evidence in forming his opinion, but the facts or data must be of the kind that "experts in the particular field would reasonably rely on . . . in forming an opinion on the subject."  Fed. R. Evid. 703.  *See Bauman*, 611 F.2d at 1120.  "As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration. . . . In some cases, however, the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion."  *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987) (internal citation omitted).  This is one such case.  The hearsay statement of counsel, absent independent investigation or verification, is not the type of evidence on which an expert like Mr. Ortega would reasonably rely to form an opinion.  *See United States v. Tran Trong*

*Cuong*, 18 F.3d 1132, 1143–44 (4th Cir. 1994) (holding that the district court erred in permitting a family medicine physician to bolster his opinion with another expert's forensic medical opinions prepared specifically for litigation because those are not the types of opinions on which an expert would rely). *See also TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732–33 (10th Cir. 1993) (holding that the opinion of an expert who based his analysis on someone else's sales projections and "failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable" failed to meet the requirements of Rule 703); *Gong v. Hirsch*, 913 F.2d 1269, 1272–73 (7th Cir. 1990) (concluding that it was not an abuse of discretion to have excluded the basis for an opinion where "the information sought to be relied on . . . [was] merely a conclusory statement, made by a doctor who was not the treating physician at the time of the illness in question, for the presumed purpose of obtaining employment disability benefits," because it was unreliable under Rule 703).

Additionally, Mr. Ortega's "vast majority" statement is little more than a vehicle by which the Wolf plaintiffs can introduce their own counsel's otherwise inadmissible hearsay statement regarding the perceived strength of their cases. *See United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (Although an expert can rely on hearsay in formulating his opinion, he "may not . . . simply transmit that hearsay to the jury. . . . Instead, the expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials.") (internal

quotation marks and citation omitted); *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) ("When an expert is no longer applying his extensive experience and a reliable methodology, *Daubert* teaches that the testimony should be excluded."). The Wolf plaintiffs have not shown that Mr. Ortega's "vast majority" statement is the product of a reliable methodology.

Mr. Ortega also didn't adequately explain how the 38% figure allowed him, based on his expertise, to opine that the decedents were probably murdered by the AUC. The preponderance of the evidence standard requires a showing that a given proportion is more likely true than not true. *See United States v. Watkins*, 10 F.4th 1179, 1184–85 (11th Cir. 2021) (en banc). It goes without saying that 38% is less than 50.1%, and a "vast majority" of 38% is even less than 50.1%. Mr. Ortega does not say how a figure that constitutes at best a plurality of the selective assassinations committed in Colombia (the 38% figure) allows the conclusion that the murders of certain decedents were probably committed by the AUC. And as we stated, an expert cannot, without more, base his opinion on an unverified assertion by the attorney who hired him.

Correlation evidence can be misleading if it "does not adequately account for other contributory variables," *United States v. Valencia*, 600 F.3d 389, 425 (5th Cir. 2010). Absent additional information regarding the link between Mr. Ortega's expertise and the

expert opinion, we cannot conclude that the district court abused its discretion. *See Frazier*, 387 F.3d at 1261.[23]

**5**

Relatedly, the parties posit that the district court excluded the *modus operandi* evidence, and some of the plaintiffs argue that this was error. *See* Non-Wolf Plaintiffs' Initial Br. at 29–36; Appellees' Answer Br. at 37–38. The *modus operandi* evidence consisted of testimony and reports stating that the AUC (1) killed "subversives" by gruesome methods and often left their victims' bodies in public to send a message; (2) kidnapped victims, often on motorcycles, as a means of terror; (3) killed victims while hooded or masked; (4) took victims from their homes at night; and (5) stopped vehicles at roadblocks to murder people. *See* Non-Wolf Plaintiffs' Initial Br. at 30–31; Non-Wolf Plaintiffs' Reply Br. at 19–22.

As with the expert testimony, the district court explained that this "circumstantial evidence" was "not, standing alone, sufficient evidence from which a reasonable jury could infer that the killings were, more likely than not, attributable to the AUC." D.E.

---

[23] The Wolf plaintiffs also argue that the district court erred in failing to consider whether Mr. Ortega's opinion was admissible as that of a lay witness under Rule 701. This argument, however, was not made to the district court, so we do not consider it. *See Access Now, Inc. v. S.W. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) ("This Court has repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered by this court.") (internal quotation marks and citation omitted).

2551 at 67. As such, the court concluded that it was "insufficient to create a triable issue of fact on causation." *Id.*

The district court also stated, however, that it "[found] no basis for admitting" the *modus operandi* evidence under Rule 404(b) because the evidence was not "specific" enough to "distinguish[ ] AUC methodologies from brutalities committed by other [groups]." *Id.* at 66. The court cited to *United States v. Myers*, 550 F.2d 1036, 1045–46 (5th Cir. 1977), for the proposition that in order to admit *modus operandi* evidence under Rule 404(b) the proponent must show "such peculiar, unique or bizarre similarities as to mark them as handiwork" of a particular individual or group. *See id.*

In the context of this case, the district court's reliance on *Myers*—which involved the improper use of Rule 404(b) *modus operandi* evidence against the defendant on trial—was mistaken. Under Rule 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." The circuits are divided on whether Rule 404(b) applies to crimes, wrongs, or acts committed by someone other than the defendant in the case (i.e., the accused or the person being sued). *See* 3 Michael H. Graham, Handbook of Fed. Evid. § 404:5 (9th ed. & Nov. 2021 update) (citing cases). As the plaintiffs argued below, *see* D.E. 2510 at 7, in the Eleventh Circuit evidence is excludable under Rule 404(b) when it relates to "acts committed by the defendant himself." *United States v. Meester*, 762 F.2d 867, 877 (11th

Cir. 1985). But Rule 404(b) does not apply to evidence pertaining to acts committed by others, even members of a conspiracy. *See id.* Indeed, "we have held in both the civil and criminal contexts that Rule 404(b) does not—at least of its own force—apply when, as here, the challenged . . . evidence implicates a witness or another non-party to the litigation." *Ermini v. Scott*, 937 F.3d 1329, 1342 (11th Cir. 2019). Instead, as we recognized in *Ermini*, "the factors articulated in Rule 404 'should be considered in weighing the balance between the relevancy of this evidence and its prejudice under Rule 403.'" *Id.* at 1343 (quoting *United States v. Sellers*, 906 F.2d 597, 604 n.11 (11th Cir. 1990)). Thus, where the evidence concerns a third party, there is no presumptive exclusion under Rule 404(b) and the analysis "takes place under the auspices of Rule 403 rather than Rule 404(b)." *See id.*

We conclude that the *modus operandi* evidence should not have been excluded under Rule 404(b). The defendants here are Chiquita and some of its executives. The AUC and its members, the subjects of the *modus operandi* evidence, are not defendants. The plaintiffs, therefore, are not submitting the evidence "to prove [the defendants'] character" in any way, let alone "to show that on a particular occasion [the defendants] acted in accordance with that character." The plaintiffs are instead offering the evidence to show that the perpetrators of the decedents' murders were members of or affiliated with the AUC. *See United States v. U.S. Infrastructure, Inc.*, 576 F.3d 1195, 1210 (11th Cir. 2009) ("Rule 404(b) does not specifically apply to exclude . . . evidence [which] involves an

extraneous offense committed by someone other than the defendant.").

When a defendant seeks to introduce so-called "reverse" Rule 404(b) evidence to point the finger at a third party, we have said that "the standard for admission is relaxed." *United States v. Cohen*, 888 F.2d 770, 776 (11th Cir. 1989). Some commentators have echoed that view. *See* 1 Mueller, Fed. Evid. at § 4:37 ("[D]efense proof of third-party acts or crimes should be admissible if they have significant features in common with the charged offense, even though the resemblance is not so extensive, and the common features are not so rare or unique, that they satisfy the 'signature' standard that applies when such evidence shows the defendant's prior crimes or acts and is offered to prove guilt on a *modus operandi* theory."); Michael H. Graham, 43 No.1 Crim. L. Bull. Article 2 (Winter 2007) (when evidence of a third party's acts is offered, "a relaxation in the degree of similarity required in comparison to when other crimes, wrongs, or acts evidence is offered by the prosecution [against a defendant] is appropriate and generally accepted"). The situation here is, of course, different in that we do not have a defendant seeking to assign blame to another. But these authorities nevertheless suggest that the district court required too much with respect to the plaintiffs' *modus operandi* evidence.

Given that Rule 404(b) does not apply in the scenario presented here, its requirements do not govern the admissibility of the *modus operandi* evidence with respect to the AUC and its members. The plaintiffs offered the *modus operandi* evidence for a

permissible purpose and the district court's reason for exclusion cannot be squared with our precedent. And because the court did not perform any Rule 403 balancing, *see Ermini*, 937 F.3d at 1343, we cannot affirm its exclusion on that basis.[24]

## G

Finally, the Non-Wolf plaintiffs argue that certain Justice and Peace documents which were not otherwise admissible fall within the Rule 807 residual hearsay exception. We disagree, and hold that the Mangones *sentencia*, the Herrera judgment, and the letters from Colombian prosecutors and investigators are not admissible under Rule 807.

Rule 807 allows a hearsay statement to be admitted, even if it doesn't fall under any exception in Rules 803 or 804, if the statement (1) "is supported by sufficient guarantees of trustworthiness—after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement," and (2) "is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." The 2019 amendment to Rule 807 embodies "a more general call for reliability." 30B Bellin, Fed. Prac. & Proc.: Evid. at § 7063.

---

[24] We express no view on how that Rule 403 balancing should play out on remand. And we do not address the other arguments made by the Chiquita defendants for exclusion of the *modus operandi* evidence because they were not addressed by the district court.

The district court ruled that because the plaintiffs did "not identify any specific piece of evidence they [sought] to admit under the residual hearsay exception," it was "unable to make an informed assessment of its applicability to any specific document or category." D.E. 2551 at 44. It also explained that, "[a]s a global proposition," the "several proffered unauthenticated, excerpted and unsigned documents" did not satisfy Rule 807 because they were not necessarily trustworthy, they were not more probative on the relevant issue than other available evidence, and the interests of justice did not compel their inclusion. *See id.* at 44–45.

When making their Rule 807 argument before the district court, the plaintiffs asserted that "[t]he reports, documents[,] and confessions" were admissible because the "Justice and Peace confessions" had "[equivalent] circumstantial guarantees of trustworthiness," were appropriately probative, and were "in the interest of justice." D.E. 2510 at 5 (citing to subsections (3) and (4) of Rule 807, which no longer exist). They did not, however, refer to any specific documents and instead seemed to treat all of the Justice and Peace documents as one. *See id.*

On appeal, the plaintiffs continue to be vague about the application of Rule 807. They argue that "the Justice and Peace documents" should have been allowed under the December 2019 version of Rule 807, and not the old version with the requirements they previously cited to the district court. They argue that the current version of Rule 807 should have applied "at least to the second of the two bellwether trials" and that we should remand for the

court to properly apply that version. *See* Non-Wolf Plaintiffs' Initial Br. at 60–61. And they maintain that the current version should apply to all the disputed evidence because the court never decided which plaintiffs would be in which trial.

For a number of reasons, the district court did not err in applying Rule 807. First, although the Non-Wolf plaintiffs were likely referring to the Hasbún indictment, the Mangones *sentencia*, the Herrera judgment, and the five letters from Colombian prosecutors and investigators in their arguments below, we do not know for sure. The court did not abuse its discretion by not engaging in the plaintiffs' guessing game. Second, the court simply applied the version of Rule 807 presented by the plaintiffs, so any error with respect to the appropriate version was invited. *See Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1279 n.15 (11th Cir. 2012) (applying the doctrine of invited error where the district court applied "the only standard the plaintiffs put forth in support of their position" because "[i]t is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party") (quotation marks omitted). "Where a party invites error," we are "precluded from reviewing that error on appeal," and we therefore cannot find any abuse of discretion with respect

76                    Opinion of the Court                    19-13926

to Rule 807.  *See United States v. Brannan*, 562 F.3d 1300, 1306 (11th Cir. 2009) (quotation marks omitted).[25]

## III

Given our rulings on the evidentiary matters, we now apply the Rule 56 summary judgment standard to the bellwether plaintiffs' cases.  We consider, of course, the evidence that was not excluded (e.g., the statistical data evidence provided by Mr. Kaplan for the Non-Wolf plaintiffs and by Mr. Ortega for the Wolf plaintiffs) and the evidence that was improperly excluded (e.g., Mr. Kaplan's ultimate opinion and the *modus operandi* evidence).

To recap, the statistical data evidence for the Non-Wolf plaintiffs (through Mr. Kaplan) was that from 1997 to 2007—the relevant time period in this case—paramilitaries were responsible for 90% of the murders in the decedents' municipalities.  *See* D.E. 2348-4 at 41.  From this and other evidence, Mr. Kaplan opined that "[m]any if not all of the human rights violations against the bellwether victims in this case were *caused* by the AUC paramilitaries." *Id.* at 52.  The statistical data evidence for the Wolf plaintiffs (through Mr. Ortega) was that 38% of selective assassinations in all

_____

[25] The Non-Wolf plaintiffs raise an additional issue concerning the district court's denial of the Wolf plaintiffs' attempt to obtain certain Justice and Peace documents in discovery.  They argue that either the discovery ruling was erroneous or summary judgment was improper.  *See* Non-Wolf Plaintiffs' Initial Br. at 62–65.  Because we are reversing summary judgment as to the Non-Wolf plaintiffs, we do not address the matter of the Justice and Peace documents.

of Colombia during the relevant period were committed by para-militaries.  This figure was offered in combination with Mr. Or-tega's statement that "when territorial control is considered, the vast majority of these crimes were committed by the group in con-trol."  D.E. 2325-4 at 17.  And for both sets of plaintiffs, the *modus operandi* evidence indicated that AUC kidnappings and murders had certain common characteristics.

There has long been a debate, in both judicial and academic circles, about whether so-called "naked statistical evidence" can sometimes allow a civil plaintiff to withstand summary judgment and prevail at trial. *See, e.g., NOCO Co. v. OJ Com., LLC*, 35 F.4th 475, 487–89 (6th Cir. 2022); *Guenther v. Armstrong Rubber Co.*, 406 F.2d 1315, 1318 (3rd Cir. 1969); *Galvin v. Eli Lilly & Co.*, 488 F.3d 1026, 1034–35 (D.C. Cir. 2002); *Howard v. Wal-Mart Stores, Inc.*, 160 F.3d 358, 359–60 (7th Cir. 1998); Frederick Schauer, Pro-files, Probabilities, and Stereotypes 81–87 (2003); Ronald J. Allen & Brian Leiter, *Naturalized Epistemology and the Law of Evidence*, 87 Va. L. Rev. 1491, 1523–26 (2001); Richard A. Posner, *An Eco-nomic Approach to the Law of Evidence*, 51 Stan. L. Rev. 1477, 1508–14 (1999); Symposium, *Probability and Inference in the Law of Evidence*, 66 B.U. L. Rev. 377, 381–952 (1986); Laurence H. Tribe, *Trial by Mathematics: Precision in the Legal Process*, 84 Harv. L. Rev. 1329, 1338–77 (1971).  The parties have not briefed this issue and have not told us anything about Colombian substan-tive law, so we do not make any broad pronouncements today.  It is enough, for our purposes, to note that statistical evidence can,

depending on its nature, be probative on the question of who committed a certain act. Cf. Kaminsky v. Hertz Corp., 288 N.W.2d 426, 427 (Mich. Ct. App. 1980) (holding, in a tort case involving a vehicular accident caused by a yellow truck with a Hertz logo, that Hertz was not entitled to summary judgment where the parties stipulated that Hertz owned "approximately 90 percent of such vehicles while the other 10 percent [were] owned by licensees or franchisees"); Ronald J. Allen, On the Significance of Batting Averages & Strikeout Totals: A Clarification of the "Naked Statistical Evidence" Debate, the Meaning of "Evidence," and the Requirements of Proof Beyond a Reasonable Doubt, 65 Tulane L. Rev. 1093, 1096 (1991) ("[S]tatistical evidence is admissible, and heavily statistical cases may be sufficient.").

## A

We review the grant of a motion for summary judgment de novo. See Lippert v. Cmty. Bank, Inc., 438 F.3d 1275, 1278 (11th Cir. 2006). Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id. (quoting Fed. R. Civ. P. 56(c)). "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Bowen v. Manheim Remktg., Inc., 882 F.3d 1358, 1362 (11th Cir. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The question here is "whether reasonable jurors could find by a preponderance of the evidence that" a bellwether plaintiff's decedent was killed by the

AUC. *See Anderson*, 477 U.S. at 252. As noted earlier, the preponderance standard requires a showing that a given proposition is more likely true than not true. *See Watkins*, 10 F.4th at 1184–85.

When we review the evidence at summary judgment, we "draw[ ] all reasonable inferences in the light most favorable to the non-moving part[ies]," which here are the plaintiffs. *See Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011). Even when the underlying facts are undisputed, summary judgment is improper if those facts can lead to conflicting inferences on material issues. *See Manners v. Cannella*, 891 F.3d 959, 967 (11th Cir. 2018) ("Even where the parties agree on the facts, '[i]f reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment.'") (alteration in original) (citation omitted).

A district court errs if it weighs the evidence or makes credibility determinations at the summary judgment stage. *See Sears v. Roberts*, 922 F.3d 1199, 1209 (11th Cir. 2019). But if a case is "so one-sided that one party must prevail as a matter of law," then summary judgment is appropriate. *See Bowen*, 882 F.3d at 1362 (citation omitted).

## B

The district court apparently considered some of the plaintiffs' evidence "standing alone." *See, e.g.,* D.E. 2551 at 8 n.5, 49, 62, 66, 67, 71. At the summary judgment stage of the proceedings, however, courts are required to consider "the totality of the

evidence adduced in [the] summary judgment record." *Lippert*, 438 F.3d at 1278.

Before turning to the individual cases, we offer one additional observation. In cases such as this one, involving acts of violence allegedly perpetrated by a terrorist group and its members, plaintiffs often lack direct evidence and are therefore more likely to rely on circumstantial evidence. *Cf. Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1051 (D.C. Cir. 2014) (explaining that it was unrealistic to expect the plaintiffs to have direct evidence that the deceased was killed at a North Korean labor camp, and holding that it was sufficient under the Foreign Sovereign Immunities Act for them to prove that "the regime abducted the [deceased], that it invariably tortures and kills prisoners like him, and that it uses terror and intimidation to prevent witnesses from testifying"). We treat circumstantial evidence the same as direct evidence. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("The reason for treating circumstantial and direct evidence alike is both clear and deep rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'") (citation omitted).[26]

---

[26] Circumstantial evidence, as Sherlock Holmes once put it, "is a very tricky thing . . . . It may seem to point very straight to one thing, but if you shift your own point of view a little, you may find it pointing in an equally uncompromising manner to something entirely different." Sir Arthur Conan Doyle, *The Boscombe Valley Mystery*, in 2 The Annotated Sherlock Holmes 136 (William S. Baring-Gould ed. 1967).

## C

We first address the claims of the Non-Wolf plaintiffs.

### 1

John Doe 7 has presented enough evidence to establish a genuine issue of material fact as to whether the AUC killed or was responsible for the murder of his son, John Doe 8. We explain why below.

In addition to the statistical data evidence, Mr. Kaplan's opinion, and the *modus operandi* evidence, John Doe 7 relied on his own testimony, *see* Part II.D.1, and the Hasbún indictment, *see* Part II.A.1, to demonstrate a genuine issue of material fact. John Doe 7's testimony—that an AUC commander did not deny that he had killed John Doe 8 and instead explained why John Doe 8 was murdered—could be relied on by a jury to conclude that John Doe 8 was an AUC murder victim. The same goes for the Hasbún indictment, which indicates that Mr. Hasbún, a different AUC leader, confessed to being responsible for John Doe 8's murder—a confession that was verified by Justice and Peace process officials. These two pieces of evidence alone show that the case is not "so one-sided" that summary judgment should have been granted in favor of the defendants. *Cf. Boim*, 549 F.3d at 702–05 (holding that, based on an expert's knowledge of Islamic terrorist organizations, review of the record, independent research, and reliance on a website controlled by Hamas, the plaintiffs set forth sufficient evidence to show that Hamas was responsible for the murder of the decedent).

Because a jury could conclude that John Doe 8 was killed by the AUC, the district court erred in granting summary judgment against John Doe 7. In so holding, we have not considered John Doe 7's other evidence, such as the letter from the Colombian prosecutor, which may or may not be found admissible on remand. *See Bowen*, 882 F.3d at 1362.[27]

## 2

Juvenal Fontalvo Camargo introduced sufficient evidence to withstand summary judgment as to whether the AUC murdered his son, Franklin Fabio Fontalvo Salas. Mr. Salas, a banana worker, was kidnapped at a banana farm, killed, and his body was later found at the entrance of a different banana farm.

Mr. Camargo presented testimony from two witnesses: Sergio Contreras Castro, who saw Mr. Salas being kidnapped; and Ever Joel Fontalvo, who found Mr. Salas' body and was later threatened for moving his body. The district court disregarded this evidence because the witnesses did "not establish any personal knowledge" for their testimony that the kidnappers, or those who made the threats, respectively, were AUC members. *See* D.E. 2551 at 58–59.

In his sworn declaration, Mr. Castro stated that he saw Mr. Salas being kidnapped by four men on motorcycles; Mr. Salas was

---

[27] Because we are setting aside the summary judgment in favor of the defendants, the plaintiffs' motion for judicial notice of evidence supporting John Doe 7's claim is denied as moot.

19-13926                Opinion of the Court                83

bound and sitting between two men on one of the motorcycles. Mr. Castro also said that one of the men who kidnapped Mr. Salas was *El Ruso*, whom he "knew as a paramilitary leader," or, in other words, an AUC leader. *See* D.E. 2346-58 at 3–4. Mr. Castro did not explain how he knew that *El Ruso* was an AUC leader, so the district court did not abuse its discretion in ruling that Mr. Camargo did not sufficiently establish Mr. Castro's personal knowledge that one of the kidnappers was an AUC member. *See Corwin*, 475 F.3d at 1250 (holding that the district court did not abuse its discretion in disregarding summary judgment evidence that was not based on personal knowledge). But Mr. Castro's eyewitness testimony regarding the kidnapping was admissible and can be considered as part of the totality of the circumstances established by Mr. Camargo. *See Lippert*, 438 F.3d at 1278.[28]

Mr. Fontalvo, in his sworn declaration, testified as to several encounters that he had with AUC members after Mr. Salas' death. He related that an AUC member "detained [him] and demanded to know why [he] had taken away [Mr. Salas's] body from where they

---

[28] In his initial brief, Mr. Camargo contends that supplemental declarations from Mr. Castro and Mr. Fontalvo provide additional support for Mr. Castro's identification of *El Ruso* as an AUC leader. He does not argue, however, that the district court erred when it denied his motion requesting reconsideration of summary judgment in light of the new declarations. By failing to properly make this argument he has abandoned it, so we do not consider the supplemental declarations. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014).

had killed him." D.E. 2346-59 at 4. Mr. Fontalvo said that AUC members later detained him a second time, asking how he was connected to Mr. Salas and saying that he shouldn't have moved Mr. Salas's body "from the place they killed him." *Id.* Mr. Fontalvo also stated that the AUC's chief in the area, *El Tijeras* (Mr. Mangones), personally called him and asked why he had taken Mr. Salas's body. Finally, Mr. Fontalvo explained that he recognized the AUC members (including *El Ruso*) based on how they were dressed—either wearing an AUC bracelet or a military uniform—and the fact that they always openly carried their weapons. Because Mr. Fontalvo sufficiently explained why he believed the people who threatened him were AUC members, the district court abused its discretion in concluding that he lacked any personal knowledge. A jury could refuse to credit Mr. Fontalvo's testimony on AUC affiliation, but it was admissible.

Taken together, Mr. Castro's testimony as to the method of the kidnapping, Mr. Fontalvo's testimony, the statistical data evidence (that 90% of the murders in the decedents' municipalities were committed by paramilitaries), Mr. Kaplan's opinion, the *modus operandi* evidence regarding the AUC's use of motorcycles for kidnappings, *see* Part II.F.2, and other circumstantial admissible evidence, such as the attendance of AUC members at Mr. Salas' wake, *see* App. 5523, are sufficient evidence for a jury to reasonably conclude that the AUC killed Mr. Salas. Although the Mangones *sentencia* is not admissible, *see* Part II.C.1, and the admissibility of Mr. Camargo's letter from the Justice and Peace investigator is to be

determined on remand, *see* Part II.A.2, we conclude that the district court erred in granting summary judgment against Mr. Camargo.

3

Jane Doe 7 presented enough evidence that the AUC killed her husband, John Doe 11. He had worked at a banana farm, had been an elected representative of his coworkers in a workers' rights' committee, and had been a member of the banana workers' union. He was kidnapped from his house, which was located in the Urabá region, by three men with their faces covered and later killed. *See* D.E. 2348-51 at 5, 9.

As noted earlier, Jane Doe 7 submitted both testimonial and circumstantial evidence about the murder of John Doe 11. Her testimony that his name was on an AUC hit list is not admissible, *see* Part II.E.3, but her testimony and that of others regarding his kidnapping and death are admissible. For example, Jane Doe 7 presented admissible evidence that the way John Doe 11 was killed—kidnapped and then stabbed, *see* App. 6091–93, 6602—was aligned with portions of the AUC's *modus operandi*.

John Doe 11, as recounted above, was the sort of labor activist targeted by the AUC. *See* Part II.F.2. His role as a labor activist presents a potential motive, which "is an integral part of any crime." *United States v. Covington*, 565 F.3d 1336, 1342 (11th Cir. 2009). And the record indicates that union leaders were often targeted by the AUC—specifically in Urabá—for being aligned with

the guerillas. *See, e.g.*, D.E. 2346-10 at 11, 2346-103 at 9; App. 6679, 6682. Moreover, Jane Doe 7 presented evidence of graffiti threatening union organizers in John Doe 11's hometown and said that the paramilitaries were there. *See* App. 6677, 6679. That circumstantial evidence further suggests that the AUC would've targeted a union leader like John Doe 11.

All of this evidence, together with the statistical data evidence and opinion provided by Mr. Kaplan, permit a jury to find that John Doe 11 was killed by the AUC. The district court therefore erred in granting summary judgment against Jane Doe 7.

4

Nancy Mora Lemus witnessed the murder of Miguel Antonio Rodriguez Duarte, her common-law spouse. She too established a genuine issue of material fact regarding the AUC's involvement in the murder.

Ms. Lemus explained how Mr. Duarte was killed, and what his murderers wore. She related that two men arrived at their house, kidnapped Mr. Duarte, walked him down a path to the river, tied him to a pole, and then cut his throat. *See* D.E. 2551 at 14 (describing D.E. 2348-45 at 16–18). The two men were armed with rifles and a knife and wore sweatshirts and green shirts. She said they were not wearing uniforms and described a symbol on their clothes as "a wheel, like a brand." *See id.* at 15 (quoting D.E. 2348-45 at 19). She explained that she knew that they were AUC

members because "they were the [only] ones who were there in that area." *See id.* at 14–15 (quoting D.E. 2348-45 at 21).

The evidence about the perpetrators and the murder does not fit the *modus operandi* of the AUC. *See* Part II.F.2. Mr. Duarte, moreover, was not a member of any targeted political parties, guerilla groups, gangs, or labor unions. *See* D.E. 2348-45 at 23. Although on appeal Ms. Lemus argues that the wheel emblem identified the men as AUC members, she testified that she did not recognize the symbol. *See* D.E. 2551 at 15 (describing D.E. 2348-45 at 18). Nor did she provide evidence connecting the symbol to the AUC.

The evidence that the AUC was in the area and the details about how Mr. Duarte was murdered, without anything else, would not be enough to establish a genuine issue of material fact about the AUC's involvement. *Cf. Sullivan v. Republic of Cuba*, 891 F.3d 6, 11 (1st Cir. 2018) (holding that second- and third-hand reports that the plaintiff's father was in a Cuban prison were not enough to establish that he was the victim of an extrajudicial killing by the state under the Foreign Sovereign Immunities Act). But there is also the statistical data evidence, which was that 90% of the murders committed in the decedents' municipalities were carried out by paramilitaries, and Mr. Kaplan's opinion. That evidence, combined with the AUC's operations in the area and the absence of another reason for the murder of Mr. Duarte, gets the claim to a jury. The district court erred in granting summary judgment against Ms. Lemus.

**5**

John Doe 11 was shot in public. Juana Doe 11 and Minor Doe 11A may have provided enough evidence to show the existence of a genuine issue of material fact with respect to who was responsible for the murder of John Doe 11. On remand, the district court will need to reconsider summary judgment after it determines the admissibility of the relevant letter from the Justice and Peace prosecutors.[29]

As explained earlier, Juana Doe 11 and Minor Doe 11A submitted several pieces of evidence that are not admissible, *see* Parts II.C.1 and II.D.2, and the *modus operandi* evidence does not fit John Doe 11's murder. But they also proffered a letter from the Justice and Peace prosecutors regarding Mr. Mangones' confession as to John Doe 11's death. *See* Part II.A.2. The additional circumstantial evidence—such as the statistical data evidence, Mr. Kaplan's opinion, and the AUC's operations in the area where John Doe 11 was killed—may be enough to survive summary judgment. We leave it to the district court on remand to determine whether the letter from the prosecutors is admissible and whether it, together with the other evidence, is sufficient to establish a genuine issue of material fact as to whether the AUC was responsible for the murder of John Doe 11.

---

[29] To avoid confusion, we note that this John Doe 11 is not the same John Doe 11 who is Jane Doe 7's decedent.

**6**

José López 339 was shot and killed by men on motorcycles. We conclude that his seven surviving children presented enough evidence about the AUC's involvement to proceed past summary judgment.

Along with other admissible evidence, such as the statistical data evidence, Mr. Kaplan's opinion, and the *modus operandi* evidence, *see* Parts II.F.1 and II.F.2, Mr. López's children presented testimony that an AUC commander apologized to them for Mr. López's death. *See* Part II.D.4. All of this evidence is enough for a jury to reasonably conclude that the AUC was responsible for killing Mr. López. The district court therefore erred in granting summary judgment against Mr. López's children.

**7**

Pablo Pérez 43A, a banana farmer who lived in an area controlled by the AUC, was shot dead at the corner of his mother's house. Juana Pérez 43A has presented evidence that may preclude summary judgment with respect to the AUC's involvement in his murder, but that ultimate determination will depend on admissibility rulings on remand.

As discussed above, *see* Part II.A.2, Juana Pérez 43A received two letters from prosecutors stating that (1) Mr. Mangones had "confessed" to killing Pablo Pérez 43A; (2) the authorities had indicted Mr. Mangones for the crime; and (3) a magistrate judge had "confirmed the criminal charges" and "issued a sentence

judgment" against him.  *See* D.E. 2346-50 at 2; D.E. 2346-77 at 2-3. The first letter sent to Juana Pérez 43A also states that Pablo Pérez 43A's "homicide" was "attributable to members of the extinct northern block of the William Rivas Front of the AUC."  D.E. 2346-50 at 2.

Juana Pérez 43A does not benefit from the *modus operandi* evidence because the murder of Pablo Pérez 43A does not share sufficient similarities with the AUC's behavior.  Although the statistical data evidence and Mr. Kaplan's opinion help her, we need not decide at this time whether that evidence is by itself sufficient. Because we have remanded on whether the letters from the prosecutors are admissible, we also set aside the summary judgment against Juana Pérez 43A.  Once the district court has determined whether the prosecutors' letters are admissible, it should then address whether summary judgment is appropriate.  If the letters are admissible, Juan Pérez 43A's claim will get to a jury.

8

Ana Ofelia Torres Torres, Pastora Durango, and Gloria Eugenia Muñoz have introduced sufficient evidence to preclude summary judgment as to the AUC's involvement in the murder of their decedents.  Ms. Torres' decedent, Ceferino Antonio Restrepo Tangarife, was a banana worker.  He was shot in the head outside of his home, which was in an AUC-dominated municipality.  Ms. Durango's decedent, Waynesty Machado Durango, was also murdered in an AUC-controlled area.  Ms. Muñoz's decedent, Miguel

Angel Cardona, was abducted and murdered by two men on motorcycles in an AUC-dominated area.

Ms. Torres, Ms. Durango, and Ms. Muñoz submitted and relied on the Hasbún indictment. *See* Part II.A.1. The indictment charged Mr. Hasbún with the murders of each of their decedents. Reading the indictment in conjunction with Mr. Sánchez León's declaration, *see id.*, there are at least two inferences that the jury could draw in the plaintiffs' favor. The first is that Mr. Hasbún confessed to being responsible for the three murders. The second is that the Justice and Peace prosecutors corroborated Mr. Hasbún's confession as part of their investigation before indicting him.

Where "reasonable minds might differ on the inferences arising from undisputed facts," summary judgment should not be granted, and a fact finder should be permitted to determine which inferences to accept. *See Clark v. Union Mut. Life Ins. Co.*, 692 F.2d 1370, 1372 (11th Cir. 1982). Here, drawing all reasonable inferences in favor of Ms. Torres, Ms. Durango, and Ms. Muñoz, and taking into account the statistical data evidence and Mr. Kaplan's opinion, a jury could reasonably conclude that the AUC, under Mr. Hasbún's command, killed Mr. Tangarife, Mr. Durango, and Mr. Cardona. The district court therefore erred in granting summary judgment in favor of the defendants as to these three plaintiffs and their decedents.

## C

We turn now to the Wolf Plaintiffs. They did not rely on the statistical data evidence provided by Mr. Kaplan, and instead submitted Mr. Ortega's data and opinions. Mr. Ortega stated that 38% of the individual murders—"selective assassination[s]"—in all of Colombia during the relevant time period were committed by paramilitaries. *See* D.E. 2325-4 at 17. He also stated that the relevant towns "were controlled by the AUC between 1995 and 1997, the range of dates of the case reviewed." *Id.* at 15. Taking those two things in combination, Mr. Ortega opined that "the vast majority of these crimes were committed by the group in control." *Id.* at 17. As noted earlier in Part II.F.4, however, the district court did not err in excluding Mr. Ortega's ultimate opinion. So we do not consider it here.

## 1

Doe 378 has not offered sufficient, admissible evidence to demonstrate the existence of a genuine issue of material fact as to the AUC's involvement in the murder of her unnamed brother. The only direct evidence she has presented shows that her brother, a banana worker, went out one evening in violation of an AUC-imposed curfew, and that at some point while he was out, he was shot and killed by an unidentified individual who took his identification card.

In support of her position, Doe 378 argues that several documents—a letter from the *Acción Social* agency and a letter from a

hospital—are admissible, but as far as we can tell they were never excluded by the district court. The hospital letter, however, does not provide any additional information or insight as to how Doe 378's brother was killed or who was responsible. The hospital letter merely discusses issues not in dispute—the time, place, and manner of death—and is therefore cumulative. As for the *Acción Social* letter, the defendants argue that it was inadmissible under Rules 803(6) and 803(8). *See* Appellees' Answer Br. at 22–27. In response, Doe 378 argues in summary fashion that the letter satisfies Rule 803(8), but that conclusory argument is insufficient. *See Sapuppo*, 739 F.3d at 681 ("[A]n appellant abandons a claim when [she] either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."). With respect to Rule 803(6), Doe 378 says that she will present a man named Carlos Eusse to provide the foundation for admissibility, but there is no evidence in the record to explain who Mr. Eusse is or how he has the knowledge to satisfy Rule 803(6). Given these fatal problems, we do not need to address any hearsay-within-hearsay related to the *Acción Social* letter.

As noted earlier, Mr. Ortega's expert report contained a statement that "[t]he paramilitaries were responsible for the vast majority of the murders in Urab[á]" from 1995 to 1997. D.E. 2325-4 at 16. That statement, however, was based on what the attorney for the Wolf plaintiffs told Mr. Ortega—that "although he accepted cases of victims of both the paramilitaries and guerillas for approximately a ten-year period each, over 90% of the [2,000] cases he

investigated were committed by the paramilitaries." *Id.* at 16–17. We do not consider this "vast majority" statement in analyzing whether Doe 378 has demonstrated a genuine issue of material fact for at least two reasons. First, the statements of the attorney as to what his "investigat[ion]" may have demonstrated about the veracity of his clients' cases are not an appropriate basis for Mr. Ortega to form an expert opinion on causation. *See, e.g., United States v. Floyd,* 281 F.3d 1346, 1349 (11th Cir. 2002). Mr. Ortega's "vast majority" statement, then, was not the product of a reliable methodology and we need not consider it. Second, the statement is little more than a vehicle for the attorney's otherwise inadmissible hearsay about the merits of his clients' cases. This, too, is impermissible. *See Mejia*, 545 F.3d at 197. For these reasons, the "vast majority" statement is not part of our summary judgment analysis here. *See* Part II.F.4.

Mr. Ortega's statistical evidence, which was that 38% of selective assassinations in Colombia during the relevant time period were committed by paramilitaries, is also not enough—alone or in combination with other evidence—to create a jury issue. We know of no case where so-called "naked statistical evidence" below a 50% threshold has been deemed enough to sustain a civil plaintiff's case on the issue of identity. *Cf. Galvin*, 488 F.3d at 1035 ("The most probative [statistical] evidence is clearly the national market share analysis used in the New York litigation, and it suggests the probability that Keller purchased a Lilly pill is less than 30 percent—well below the 'more likely than not' standard. On this

19-13926                Opinion of the Court                95

record, a reasonable juror could not conclude Lilly was more likely than not the manufacturer of the pills Keller took.").

At best, Doe 378 has offered a "mere scintilla of evidence." *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006) (quotation marks omitted). This, however, "will not suffice; there must be enough of a showing that the jury could reasonably find for [Doe 378]." *Id.* (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)). *See also Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1326 (11th Cir. 1982) ("[A] jury will not be allowed to engage in a degree of speculation and conjecture that renders its finding a guess or mere possibility."). Thus, the district court properly granted summary judgment against Doe 378.

### 2

The district court granted summary judgment against Doe 840 (Genoveva Isabel Borja Hernandez) because she did not offer admissible evidence linking her unnamed son's murder to the AUC. *See* D.E. 2551 at 60–61. Ludy Rivas Borja, the daughter of the now-deceased Doe 840, seeks to challenge that ruling on appeal.

Generally, "only parties to a lawsuit, or those that properly become parties, may appeal an adverse judgment." *AAL High Yield Bond Fund v. Deloitte & Touche LLP*, 361 F.3d 1305, 1309 (11th Cir. 2004) (quoting *Marino v. Ortiz*, 484 U.S. 301, 304 (1988)). Ms. Rivas Borja twice moved to substitute herself as a plaintiff in

place of Doe 840. In her motions, Ms. Rivas Borja argued that under Colombian law, "[a]s the victim's [sister], [she] is a proper party to the case, and may represent the interests of her siblings, as long as she has their permission." D.E. 2124 at 2. The defendants opposed those motions, asserting that Ms. Rivas Borja had failed to show that she was the "proper party" to be substituted under Colombian law. *See* Fed. R. Civ. P. 25(a)(1). *Cf. Escareno v. Noltina Crucible & Refractory Corp.*, 139 F.3d 1456, 1459 (11th Cir. 1998) (explaining that a court should refer to state law to determine if substitution is by a "proper party").

The district court denied Ms. Rivas Borja's first motion for substitution because the documents "submitted in support of [the] motion [were] all in Spanish," and it was "unable to decipher" them. *See* D.E. 2179 at 1. The court later denied the renewed motion as moot following its grant of summary judgment for the defendants.

An order denying a motion for substitution is not a final decision under 28 U.S.C. § 1291 unless it has "the effect of a dismissal." 1 Motions in Fed. Court § 6:75 (West 3d ed. & Mar. 2022 update). *Compare Va. Land Co. v. Miami Shipbuilding Corp.*, 201 F.2d 506, 508 (5th Cir. 1953) (denial of motion to substitute was not a final decision because it was not an order of dismissal), *with Panther Pumps & Equip. Co. v. Hydrocraft, Inc.*, 566 F.2d 8, 22–23 & n.9 (7th Cir. 1977) (denial of motion to substitute is reviewable once there is a final decision). In her initial brief, however, Ms. Rivas Borja did not contest either denial of her motions to

substitute. Instead, she challenged the entry of final judgment against Doe 840 as though she had in fact been substituted as the plaintiff in place of Doe 840. *See* Wolf Plaintiffs' Initial Brief at 6 n.4 ("The term 'Doe 840' as used in this brief generally refers to the substitute plaintiff."). In her reply brief, Ms. Rivas Borja attempted to raise arguments, for the first time, largely related to the denials of her motions to substitute. But those arguments come too late. By failing to present these arguments in her initial brief, she has abandoned them. *See, e.g., Allstate Ins. Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994) ("Issues that clearly are not designated in the initial brief ordinarily are considered abandoned.").

"A substituted party steps into the same position as the original party." *Ransom v. Brennan*, 437 F.2d 513, 516 (5th Cir. 1971). But having failed to properly challenge the district court's denials of her motions to substitute, Ms. Rivas Borja cannot contest the district court's summary judgment ruling as to Doe 840. *See, e.g., Karcher v. May*, 484 U.S. 72, 77 (1987); *Wolff v. Cash 4 Titles*, 351 F.3d 1348, 1353–54 (11th Cir. 2003). Under the circumstances, Ms. Rivas Borja has not established that she has a "'direct stake' in the outcome," *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013), and we therefore dismiss her appeal.

## IV

We now turn to two cross-appeals filed by some of the defendants. In the first cross-appeal, Carla Hills—as the personal representative of the estate of Roderick Hills, Sr.—asserts that the district court erred in exercising personal jurisdiction over the estate.

98                    Opinion of the Court                    19-13926

In the second cross-appeal, the individual defendants argue that the TVPA claims against them in the five complaints of the bellwether plaintiffs did not satisfy Rule 8's plausibility standard.

## A

Mr. Hills, a former Director of Chiquita and President of the Board's Audit Committee, was named as a defendant in the actions filed in New Jersey and Washington D.C. Ms. Hills, as personal representative of the estate of Mr. Hills, asserts that the district court erred in asserting personal jurisdiction over the estate. Specifically, she argues that the court mistakenly ruled that the estate waived its personal jurisdiction objection. *See* Individual Defendants' Principal Cross-Appeal Br. at 123–25.

Where a "party [to a lawsuit] dies and the claim is not extinguished," and upon a timely motion by a party, "the court may order substitution of the proper party." Fed. R. Civ. P. 25(a)(1). Generally, if personal jurisdiction "has been previously acquired of the original party, then [it] continues over the substituted party." *Ransom v. Brennan*, 437 F.2d 513, 518 (5th Cir. 1971) (interpreting Rule 25(a)(1)). This case, however, may involve a procedural wrinkle. Although Mr. Hills had been served prior to his death, he had not yet had an opportunity to challenge the court's personal jurisdiction over him due to a stay of the proceedings pending an unrelated interlocutory appeal to this court. It is at least arguable, then, that upon substitution Ms. Hills, as personal representative of the estate, could have asserted personal jurisdiction objections on behalf of the estate.

19-13926                Opinion of the Court                99

After Mr. Hills passed away, his attorney filed a suggestion of death.  Once the district court granted the plaintiffs' motion to substitute his estate as a party, Ms. Hills filed a motion to dismiss the claims against the estate on several grounds.  In that motion, Ms. Hills joined a motion to dismiss that had been filed by the other individual defendants, stating that "[a]s explained in [their] motion, a New Jersey court cannot exercise jurisdiction over an estate constituted in the District of Columbia."  D.E. 912 at 1–2.

Significantly, Ms. Hills did not cite any legal authorities to support her legal position.  The district court denied Ms. Hills' motion to dismiss, concluding that by merely joining the other defendants' motion and failing to make her own, factually-specific jurisdictional arguments, she had waived the estate's objection to personal jurisdiction.  *See* D.E. 1493 at 7–8.[30]

On appeal, Ms. Hills argues that the district court erred in concluding that she had waived the estate's personal jurisdiction argument because waiver requires "some intentional and deliberate action," which she did not take.  *See* Appellees' Answer Br. at 123.  She contends that her statement incorporating the individual defendants' arguments in their motion to dismiss was sufficient because it "addressed the only allegation in the [c]omplaint

---

[30] Although Ms. Hills raised numerous other grounds for dismissal in the district court, she does not assert any of those grounds on appeal.

concerning personal jurisdiction"—that Mr. Hills was a D.C. resident before his death. *See id.* at 123, 125.

The problem for Ms. Hills is that her motion was specific to Mr. Hills' estate, not Mr. Hills individually. So any arguments raised by the individual defendants in their own motion to dismiss did not "explain[ ]" why "a New Jersey court [could not] exercise jurisdiction over an estate constituted in the District of Columbia." D.E. 912 at 1–2. In fact, the individual defendants' motion did not speak at all to the point Ms. Hills was making. Their motion did not set forth any arguments regarding the court's personal jurisdiction over any estate and did not cite any case law for the proposition that courts only have personal jurisdiction over estates in the jurisdictions where they have been constituted. Additionally, the individual defendants, to the extent they contested personal jurisdiction, raised specific points regarding their lack of minimum contacts with the subject forums. The minimum contacts analysis as it pertains to the individual defendants is not the same as the analysis that would have been required for Mr. Hills' estate. *See generally Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 373–75 (5th Cir. 2003) (explaining the personal jurisdiction analysis for an estate).

Joining in the individual defendants' motion to dismiss, then, did not preserve the estate's objection to personal jurisdiction. *Cf. United States v. Ramirez-Rivera*, 800 F.3d 1, 12 n.1 (1st Cir. 2015) (explaining that although a party may adopt a co-party's brief or motion, "[a]doption by reference cannot occur in a vacuum

and the arguments must actually be transferable from the propo-
nent's to the adopter's case") (citation omitted).  Ms. Hills was re-
quired to provide the district court with arguments and authorities
supporting her personal jurisdiction arguments as to the estate, and
she failed to do so.

On this record, we cannot conclude that the district court
erred by failing to apply a body of case law that Ms. Hills failed to
present.  Though Ms. Hills may not have necessarily "waived" the
estate's personal jurisdiction argument, she certainly did not
properly raise and preserve it either.  And "generally [we] will not
consider a legal issue or theory unless it was presented to the [dis-
trict] court." *Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d
355, 360 (11th Cir. 1984).

## B

The individual defendants contend that the bellwether
plaintiffs, in their five respective complaints, failed to plead plausi-
ble claims against them under the TVPA.  They assert that the com-
plaints did not sufficiently allege state action and did not state
claims for aiding and abetting because they failed to identify under-
lying violations by a primary tortfeasor.  The district court, they
argue, should have dismissed the TVPA claims in the five com-
plaints under Rule 12(b)(6).  *See* Individual Defendants' Principal
Cross-Appeal Br. at 109–23.  Based on recent precedent, we con-
clude that the individual defendants' challenge to the denial of their
Rule 12(b)(6) motion to dismiss is not cognizable in this procedural
posture.

In *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011), which involved a civil rights claim under 42 U.S.C. § 1983, the Supreme Court held that, on appeal from a jury verdict in favor of the plaintiff, the defendants could not appeal the denial of their motion for summary judgment and could only contest the sufficiency of the evidence through proper Rule 50 motions. "To the extent that the [defendants] urge [that the plaintiff] has not proven her case, they were . . . obliged to raise that sufficiency-of-the-evidence issue by postverdict motion for judgment as a matter of law under Rule 50(b)." *Id.* at 191–92. In our circuit, after *Ortiz*, "a party may not appeal an order denying summary judgment after there has been a full trial on the merits." *Pensacola Motor Sales, Inc. v. Eastern Shore Toyota, LLC*, 684 F.3d 1211, 1219 (11th Cir. 2012).

The Sixth Circuit extended *Ortiz* to motions to dismiss in *Nolfi v. Ohio Ky. Oil Corp.*, 675 F.3d 538, 545 (6th Cir. 2012), reasoning that "[t]hough *Ortiz* applies specifically to summary judgment, its logic applies with equal force to questions involving pleadings." Subsequently, some in the academy have advocated for allowing review of denials of motions to dismiss in appeals following a trial on the merits. *See, e.g.*, Luke Meier, *The Reviewability of Denied Twombly Motions*, 84 U. Cin. L. Rev. 1145, 1199–200 (2016) (asserting, in part, that "[t]he rationale of *Ortiz* does not apply to *Twombly* motions" because a "*Twombly* analysis is a unique analysis that is not replicated at later stages of the trial court proceedings").

We have recently sided with the Sixth Circuit. In *Financial Information Technologies, LLC v. iControl Systems, USA, LLC*, 21 F.4th 1267 (11th Cir. 2021), a trade secrets case, the defendant appealing an adverse jury verdict argued in part that the district court had erred in denying its motion to dismiss because the plaintiff had "failed to allege its trade secrets with 'reasonable particularity.'" *Id.* at 1273 n.2. We declined to address the Rule 12(b)(6) argument, holding that "those [pleading] concerns dissipate when, as here, the alleged trade secrets have been litigated in a full-blown trial." *Id.* In support, we cited with a *cf.* signal to the Supreme Court's decision in *Ortiz* and to the Sixth Circuit's decision in *Nolfi. See id.*

This case, unlike *Ortiz*, *Nolfi*, and *iControl*, does not involve an appeal after a trial on the merits. Instead, the appeal is by the plaintiffs after summary judgment was granted against them. And the individual defendants are arguing in a cross-appeal—and not as an alternative ground for affirmance—that their motion to dismiss the TVPA claims should have been granted. Despite these differences, we believe the logic of *Nolfi* and *iControl* applies here. When a case reaches the summary judgment stage, the operative question is no longer whether the allegations in the complaint made out a plausible claim, but whether the non-moving party has presented sufficient evidence on the claim to get to a jury. In the words of *iControl*, any pleading issues "dissipate" when the district court evaluates the sufficiency of the evidence at summary judgment. We therefore do not address the individual defendants' Rule 12(b)(6) arguments as to the TVPA claims.

## V

Accordingly, we AFFIRM in part, VACATE and REMAND in part, REVERSE and REMAND in part, and DISMISS in part, as follows.

- We affirm (a) the summary judgment entered against Doe 378, (b) the denial of Carla Hills' motion to dismiss the claims against the Estate of Roderick Hills for lack of personal jurisdiction, and (c) the denial of the motions of the individual defendants to dismiss the TVPA claims.
- We vacate the summary judgments entered against Juana Doe 11 and Minor Doe 11, and Juana Pérez 43A and remand for further proceedings.
- We reverse the summary judgments entered against John Doe 7, Juvenal Fontalvo Camargo, Jane Doe 7, Nancy Mora Lemus, José López 339's seven surviving children, Ana Ofelia Torres Torres, Pastora Durango, and Gloria Eugenia Muñoz and remand for further proceedings because there are issues of material fact as to whether the AUC murdered their decedents.
- We dismiss the appeal of Doe 840.